STATE OF NORTH CAROLINA v. MARIE HILL

No. 2

(Filed 10 December 1969)

1. **Criminal Law § 135; Homicide § 31— capital case — written plea of guilty — former G.S. 15-162.1**

   In order for [former] G.S. 15-162.1 to become applicable or operative, a defendant and his counsel were required to file a written plea of guilty which the prosecution and the court might or might not approve, the failure to tender such a plea leaving the section inoperable.

2. **Criminal Law § 135; Homicide § 31— repeal of G.S. 15-162.1 — plea of guilty in capital case — G.S. 14-17 — punishment for first degree murder**

   The repeal by the 1969 Legislature of G.S. 15-162.1 (which provided for a sentence of life imprisonment to be imposed upon an accepted plea of guilty to a capital crime) did not change, add to or take from G.S. 14-17, which provides for the death sentence for first degree murder in the absence of a recommendation of life imprisonment.

3. **Homicide § 31; Criminal Law § 135— jury verdict of first degree murder — death penalty**

   Where the jury returns a verdict of guilty of murder in the first degree without a recommendation that the punishment be imprisonment for life, the trial court is required to impose the death sentence.

4. **Homicide § 31; Criminal Law § 135— sufficiency of verdict to support death penalty**

   In this first degree murder prosecution, the jury's verdict was sufficient to support imposition of the death penalty, where the jury foreman an-

nounced that the jury found defendant guilty of murder in the first degree, the court asked the foreman whether the jury made any recommendation with that verdict, to which the foreman replied, "We didn't come to that agreement," the court again asked whether the jury made any recommendation, the foreman answered, "We did not," and the jury answered "Yes" when asked by the clerk whether they found defendant guilty of first degree murder.

**5. Homicide § 29— instructions — capital case — right to recommend life imprisonment**

In this first degree murder prosecution, the trial court fully and correctly charged the jury with respect to the right of the jury as a part of its verdict to make the recommendation that punishment should be imprisonment for life, which recommendation would require the court to impose that sentence and no other.

**6. Criminal Law § 75— confession by 17-year-old defendant — absence of counsel — admissibility**

In this first degree murder prosecution, contention by seventeen year old defendant that her confession made in the absence of counsel should have been excluded because of her age and immaturity is without merit, since one who has arrived at the age and condition of accountability may make a valid waiver of counsel and may make a voluntary confession.

**7. Constitutional Law § 32; Criminal Law § 21— waiver of preliminary hearing without counsel**

In this first degree murder prosecution, defendant was not prejudiced by waiver of a preliminary hearing without counsel, where nothing said or done at the preliminary hearing had a bearing on the trial.

**8. Criminal Law §§ 76, 123— voluntariness of confession — question for court — submission of issue to jury**

In this first degree murder prosecution, the trial court did not err in failing to submit to the jury an issue as to the voluntariness of defendant's confession, since under North Carolina procedure voluntariness is a preliminary question for the trial judge in the absence of the jury.

**9. Homicide §§ 25, 31— killing in perpetration of robbery — possible verdicts**

When the indictment and evidence disclose a killing in the perpetration of a robbery, only a verdict of guilty as charged, guilty as charged with a recommendation of life imprisonment, or not guilty may be returned by the jury, and the court should so instruct the jury.

**10. Homicide § 30— instructions — homicide committed in perpetration of robbery — failure to submit issue of second degree murder**

In this prosecution for first degree murder committed during the perpetration of a robbery, the trial court did not err in failing to instruct the jury that it might return a verdict of guilty of second degree murder, where all of the evidence shows a killing in the perpetration of a robbery.

**11. Criminal Law § 146; Constitutional Law § 10— judicial powers — appeal not based on errors of law**

Consideration of an appeal not based on errors of law is beyond judicial competence.

**12. Constitutional Law § 5— division of governmental powers**

Under the constitutional division of governmental powers, the Legislative Branch makes the laws, the Judicial Branch interprets them, and the Executive Branch executes them.

**13. Criminal Law § 146; Constitutional Law § 10— powers of Supreme Court**

The Supreme Court hears appeals and determines whether the trial court committed prejudicial error of law or of legal inference, but the Court has neither the power to change the law nor to remit the penalty which the law provides for its violation.

**14. Constitutional Law §§ 6, 9; Criminal Law § 138— legislative and executive powers — punishment for crime**

Appeals for changes in the law should be made to the Legislature; appeals for relief from its penalties after conviction should be made to the Governor.

MOORE, J., did not participate in the consideration or decision of this case.

BOBBITT, C.J., and SHARP, J., dissenting as to death sentence.

APPEAL by defendant Marie Hill from a verdict of guilty of murder in the first degree and the sentence of death imposed thereon by *Fountain, J.* at the December 16, 1968 Criminal Session, EDGECOMBE Superior Court.

The defendant was tried upon the following bill of indictment:

"NORTH CAROLINA          SUPERIOR COURT

EDGECOMBE COUNTY     NOVEMBER TERM, A.D. 1968.

The jurors for the State upon their oath present, That Marie Hill, Carolyn Fox, Mamie K. Higgs and Bessie Doretha Wilkins late of the County of Edgecombe, on the 7th day of October, in the year of our Lord one thousand nine hundred and sixty-eight, with force and arms, at and in the County aforesaid, unlawfully, willfully and feloniously, and of their malice aforethought, did kill and murder one W. E. Strum, said killing having been committed in the perpetration of the felony crime of robbery with firearms, to wit; the unlawful willful and felonious armed robbery of W. E. Strum against the form of the statute in such case made and provided and against the peace and dignity of the State.

Roy Holdford /s/
Solicitor"

Marie Hill was arrested in South Carolina on October 25, 1968 under a Rocky Mount Recorder's Court warrant charging murder

in the felonious killing of W. E. Strum, in the perpetration of a felony — robbery with firearms. The following day she signed a waiver of extradition and was returned to Rocky Mount, North Carolina for trial. On October 28, she was brought before the Rocky Mount Recorder's Court, waived a preliminary hearing, and was ordered held for Grand Jury action. On November 4, 1968, Judge Copeland entered an order appointing Vinson Bridgers, Esq. as her attorney.

On December 17, 1968, the defendant and her court appointed attorney appeared before the Superior Court of Edgecombe County. She was arraigned and entered a plea of not guilty. Twelve jurors and one alternate were duly selected, sworn and empaneled to try the case. The State began the introduction of evidence, the substance of which we recite, with actual quotations from the testimony of material witnesses.

Prior to October 7, 1968, W. E. Strum operated a grocery store on Albemarle Avenue in Rocky Mount. At a few minutes after 10:00 on that day, Gladys Garrett entered the Strum store, as was her custom during her ten minute morning break. She saw the body of Mr. Strum partially concealed behind the drink box, and called the police. In response to her call, officers Mullen and Winstead went to the store. Finding the dead body of W. E. Strum, they called Dr. O. E. Bell, Assistant Coroner, who was admitted to be a medical expert in the general practice of medicine. Dr. Bell testified: "I did have occasion last October to view the body of Mr. W. E. Strum, of Rocky Mount. I saw him on the floor of his store. I observed that he had about six lacerations in various areas of his scalp. By laceration I mean cuts. They were not necessarily clean cuts; they looked like they had been struck with some object. He had approximately six of those in his scalp. . . . I observed that he had a bullet hole just to the left of the midline of his chest about three inches below the left nipple. Mr. Strum was dead at the time I observed him. He also had an injury on his left index finger, kind of a bruised place on that finger. He also had a bullet wound in his head. * * * . . . There was a bullet wound on the body of Mr. Strum at about the level of the top of the left ear, and, as I said, the six lacerations on his scalp. The wound at the top of the left ear was just a little puncture, a little hole there, which was in keeping with bullet wound; it looked more like a bullet wound than anything else. I observed that blood had run out around the head region; there was quite a little blood there on the floor. I did form an opinion as to the cause of death of Mr. W. E. Strum. He had enough head injuries to kill him, or the bullet wound in his chest, I would say either

one or both . . . contributed to his death, the loss of blood and shock from these wounds, and of course injuries on his scalp contributed, too; I suspect there were enough of those to kill without the bullet wounds, but I would say the bullet wounds were the main thing that killed him."

· Officer Mullen testified for the State, describing the conditions in the interior of the store as he found them. ". . . The cash register was right next to the end of the counter before you got to the Coca-Cola box. The Coca-Cola box was across the end of the counter with just enough room there to go between the Coca-Cola box and the end of the counter where the cash register was. Then you could go on back towards the back of the store and in the right corner there was a sink with two faucets. The back door is on the right-hand side as you turn back to the left. That is where Mr. Strum was lying. His feet were towards the door. He was lying on his right side with his head towards the meat counter, which is at the end of the Coca-Cola box across the back of the store. * * * . . . There was a large puddle of blood right under Mr. Strum's head. There was a bullet wound in the left forehead just across the front of his left ear. It was right along here on his left forehead (witness indicating). His left front pocket was turned inside out and bloodstains were on his pants in the area of his pocket. . . . There were bloodstains around his pocket. * * * . . . I found a Dr. Pepper bottle just behind the drink box which had blood all over the side of it and also some hair embedded in the blood. * * * I arrived at the scene at approximately 10:25 in the morning. At that time, Mr. Strum was dead. . . . I looked at a pasteboard box directly behind where Mr. Strum was lying and I found a .25-caliber shell in that box. The shell was three or four feet to the rear of where Mr. Strum was lying. That was a .25-caliber empty shell. That was found at the back of the store. There was also a shell found in the front window on the right-hand side as you go in the store. That was lodged up in the window at the front. That shell was also a .25 automatic. I examined the cash register. I observed that the cash register was open and that there were no bills in the cash register. There was just a little change, some dimes, nickels and a few pennies, and one check. I determined that one bottle of bleach had been knocked off the counter and two packs of B-C's were lying on the floor behind the counter. * * * . . . I recovered a .25 automatic slug from the right side, the one that went in below the rib cavity and was almost up to the skin in the right rear part of his back. I do have that with me today. I have the shells that I found in the store. These are the two shells that came from Mr. Strum's store. This is the slug

that came out of Mr. Strum. * * * I did not find any type of wallet or billfold or purse on Mr. Strum when I examined him."

The officer explained that a .25 caliber automatic pistol, on being fired, automatically ejects the empty shell, throwing it a few feet to the right. The breech block opens by the force of the exploding shell. A coil spring closes the breech block and feeds a loaded shell from the magazine into the chamber, leaving the weapon ready to fire by trigger pressure.

In consequence of the leads developed during the investigation, the police, on October 25, obtained from the Rocky Mount Recorder's Court a warrant charging Marie Hill with the murder of W. E. Strum. She and her companion, Susie Wilkins, were arrested in Williamsburg County, South Carolina the same day and held for the North Carolina officers. The following day, officers Winstead and Mullen of the Rocky Mount Police Department interviewed Marie Hill in the Williamsburg County Sheriff's office, Kingstree, South Carolina.

When the solicitor asked Officer Mullen what statement, if any, Marie Hill made, defense counsel objected. The court, in the absence of the jury, conducted a voir dire examination in great detail to determine whether her statements were freely, voluntarily and understandably made. The defendant did not offer any evidence on this preliminary inquiry. At the conclusion of the voir dire, Judge Fountain made these findings: "Upon objection to the question asked by the Solicitor to Officer Walter G. Mullen, wherein the Solicitor seeks to elicit testimony of statements alleged to have been made by the defendant to Officer Mullen and Officer Winstead in Kingstree, S. C., and thereafter the Court conducted a voir dire examination upon objection by defendant and in the absence of the jury to determine whether the defendant had been fully advised of her constitutional rights before making any alleged statement to the aforesaid officers, and also to determine whether any alleged statements made by her were voluntary. The State offered evidence touching upon both questions. The defendant through counsel has elected not to offer evidence. Upon the evidence offered, the Court finds as a fact that in the afternoon of the 26th of October, 1968, in the Sheriff's Office at the County Jail in Kingstree, S. C., the defendant, in the presence of Officer Winstead and Officer Mullen, the Sheriff of Williamsburg County, South Carolina, and an agent with the South Carolina Law Enforcement Division, was interviewed by Officer Winstead. At the onset of their meeting, Officer Winstead, who was known to the defendant as a North Carolina officer, advised the de-

fendant that she had a right to remain silent, that anything that she said to the officers could be used in court against her, that she had a right to have a lawyer to advise her and to be present, and that if she was unable to employ counsel, counsel would be appointed for her, and that no questions would be asked until she had had an opportunity to confer with counsel, and that if she elected to make any statement she could stop at any time. The officer thereupon repeated each of her rights and she, in response to each question, said that she understood each of her rights as explained to her by the officer. After so informing Officer Winstead that she did understand each of her rights, she stated that if she had done something a lawyer could not undo it and that she wanted to tell the truth. That Officer Winstead told her at the time that if she wished to tell him anything to tell the truth or he would prefer that she tell him nothing. That the defendant then told the officer that she knew that he knew something or he would not be down there. That the officer told her that he had talked with Susie and he knew some things and some things he did not know. Whereupon, the defendant made certain statements to Officer Mullen and Officer Winstead. That Officer Winstead had given similar warnings to the defendant on another occasion about two years before, and had been acquainted with her and she with him for about five years. After having made statements to the officers, the defendant voluntarily agreed to reduce her statement to writing in her own handwriting, and while she was reducing her statement to writing the officers left her alone and informed her that they would be in an adjoining room or outdoors and she could let them know when she had completed the writing. That, during the interview between Officers Winstead and Mullen and others present and the defendant, there was no threat of any kind made against the defendant, nor any promise of reward or hope of reward, or any inducement, or any suggestion of duress to persuade the defendant to make any statement whatever. * * * The Court finds that such statements as were made by the defendant to Officer Winstead and Officer Mullen were freely, voluntarily and understandingly made without any inducement or duress of any kind and after the defendant had been fully and thoroughly advised of her constitutional rights regarding the making of a statement, and that the defendant thoroughly and fully understood her rights. Notwithstanding such understanding on her part, she thereupon made certain statements to Officer Winstead and Officer Mullen. Upon such finding, the objection by the defendant is overruled."

The findings of fact were amply supported by the evidence on the voir dire.

Officer Winstead, who had had occasion to question the defendant on prior offenses, testified that in the Sheriff's office in Kingstree he interrogated the defendant. Before any questions were asked about her possible connection with the Strum murder, he warned her that she need not answer any questions; that if she did volunteer to answer questions, her answers could and would be used against her in court; that she was entitled to counsel, and if she could not obtain an attorney on her own account the State would furnish counsel; that she was entitled to have a lawyer present during the questioning if she wanted one. Her reply was "I understand that. If you have done something a lawyer can't undo it is because it is already did."

The defendant then stated that the city inspector "was on my mother's back to fix up the house". She decided she "would invest herself on some money". Mamie Higgs, Carolyn Fox and Susie Wilkins agreed to help. Mamie and Susie said they would be on the lookout on the street corner. Carolyn was to enter Mr. Strum's store and come back in five minutes if Mr. Strum was alone. When Carolyn came out promptly, the defendant entered the store. Mr. Strum was placing cigarettes on the shelf. The defendant picked up an iron poker at the stove, struck Mr. Strum on the side of the head; he staggered and fell across the counter. She then shot him in the head with a .25 caliber automatic pistol. She dragged him to the end of the counter, broke two sofe drink bottles over his head, and when he groaned and struggled she shot him again in the stomach. She took the billfold from his pocket and all the bills in the cash register. All told, she got "a large amount of money". Between the time of the robbery and her arrest, she detailed a drinking and spending spree with her friends, which left her with $3.00 at the time the officers arrested her and her friend, Susie Wilkins.

Officers Mullen and Winstead testified that she consented to return with them to North Carolina without extradition proceedings. On the day of the interrogation, October 26, and with the defendant's consent, the officers returned her to Rocky Mount, North Carolina. When they arrived at the police headquarters, the officers brought her friend, Virginia Staton, into the office. As soon as Marie and Virginia saw each other, Virginia said: "Marie, you couldn't have done it because you were with me that day." Marie then said she did not commit the crime. "It is all a story." Marie and Virginia were then separated. It is in evidence, without objection, that Virginia said they went to Snow Hill on October 7; Marie said they went to Durham.

The following day the officers again interrogated Marie about the conflict between the confession she made and reduced to writing the previous day in South Carolina, and the denial the night before in the presence of Virginia Staton. She then stated she robbed and killed Mr. Strum as she had told them in South Carolina. They then asked if she would go to the store and show them how the hold up and shooting occurred.

She went to the store with the officers and voluntarily re-enacted the occurrences there on the morning of October 7. She pointed out to the officers where Mr. Strum was stacking cigarettes on the shelf; where she hit him with the poker; his position when she fired the two shots, and how she hit him with the soft drink bottles. She threw one of the bottles under the meat box. She pointed out this bottle to the officers, who had failed to find it during their investigation.

When asked whether she had intended to rob Mr. Strum or to rob and kill him, she said she had planned to rob and kill him. When asked why she intended to kill him, she said, "You think I'm crazy? That man knew me just as good as you do, and I won't going to have him running up there telling you all who I was."

At the conclusion of the State's evidence the court overruled the motion to dismiss. Marie Hill was the first defense witness. She testified she had nothing to do with the robbery or the killing of Mr. Strum. "I was in Snow Hill with Virginia, her brother and her mother. That is, Virginia Staton." She admitted the officers gave her the warnings and cautions as they had testified. In her cross examination she admitted she made to the officers the statements that she had planned the robbery and the killing and that she went into the store and carried out the plan. She denied, however, that her story was true and contended that it was made up by her. When asked how she got money to finance the drinking and spending orgy after October 7, she stated that she got the money by holding up an ABC store in South Carolina. On cross examination, she admitted that she had been convicted of forgery three times; larceny five times, and that she had been convicted of cutting two boys with a knife.

She stated she got the idea for the story she told the officers involving herself in robbing and killing Mr. Strum from one Raymond Lucas. "I do say that I told him (Mr. Winstead) that I murdered Mr. Strum knowing that I could go to prison for that. He did not in any way put any pressure on me to confess. I did tell him I wanted to go ahead and tell the truth. That is not what I did. I

told him I wanted to tell the truth about it and then turned around and told a lie about it."

Virginia Staton testified for the defendant that she, Marie and Johnny Hines left Rocky Mount before 9:00 on the morning of October 7, went to Snow Hill, and returned to Rocky Mount about 5:30 or 6:00 in the afternoon. They then learned that Mr. Strum had been killed. Johnny Hines testified for the defendant that he, Marie and Virginia left about 7:45, went to Snow Hill and did not return to Rocky Mount until after 5:30 in the evening, and that Marie was with him and his sister, Mrs. Staton, the entire day. Lola Peoples, mother of Virginia Staton and Johnny Hines, testified that on October 7, about 9:30, Johnny, Virginia and Marie got to her house and all of them went to Snow Hill and did not return until after 5:00. In rebuttal, Officer Mullen testified that Virginia Staton told him that on the morning of October 7 they left "sometime after 10:00 for Snow Hill".

The defendant renewed the motion to dismiss at the close of all the evidence. The motion was denied. After the arguments, and the court's charge, the jury returned to the courtroom and were asked if they had agreed upon a verdict. The jury replied "We have".

CLERK:  Who shall speak for you?

JURY:  Fred Williams.

CLERK:  What is your verdict?

JUROR WILLIAMS:  Your Honor, we, the Jury, find the Defendant guilty of First-Degree Murder.

COURT:  Mr. Foreman and gentlemen, with that verdict do you make any recommendation?

JUROR WILLIAMS:  We didn't come to that agreement.

COURT:  Well, I just ask you if you do make a recommendation or not?

JUROR WILLIAMS:  We did not.

CLERK:  Hearken to your verdict, as the Clerk recordeth, You say that Marie Hill is guilty of Murder in the First Degree whereof she stands charged, so say you all?

BY THE JURY:  Yes.

Motion for a new trial was denied. The sentence of death was pronounced. The defendant gave notice of appeal.

*Robert Morgan, Attorney General; Ralph Moody, Deputy Attorney General; Carlos W. Murray, Jr., Staff Attorney, for the State.*

*J. LeVonne Chambers, Chambers, Stein, Ferguson & Lanning, Roy C. Boddie for the defendant.*

*North Carolina Civil Liberties Union, Norman B. Smith, Charles E. Lambeth, Jr., Kenneth S. Broun, Kenneth S. Penegar, Amicus Curiæ.*

HIGGINS, J.

Article XI, Section 2, North Carolina Constitution, provides: ". . . murder, arson, burglary, and rape, and these only, may be punishable with death, if the General Assembly shall so enact."

The General Assembly, by G.S. 14-17, provided: "Murder in the first and second degree defined; punishment. — A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, robbery, burglary or other felony, shall be deemed to be murder in the first degree and shall be punished with death; Provided, if at the time of rendering its verdict in open court, the jury shall so recommend, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury. All other kinds of murder shall be deemed murder in the second degree, and shall be punished with imprisonment of not less than two nor more than thirty years in the State's prison."

The proviso was inserted in the section by Chapter 299, Session Laws of 1949. At the same time, similar provisions were inserted in the other capital felony statutes, pertaining particularly to arson, first degree burglary, and rape. By Chapter 16, Session Laws of 1953, the General Assembly enacted G.S. 15-162.1, which provided: "Plea of guilty of first degree murder, first degree burglary, arson or rape. — (a) Any person, when charged in a bill of indictment with the felony of murder in the first degree, or burglary in the first degree, or arson, or rape, when represented by counsel, whether employed by the defendant or appointed by the court under G.S. 15-4 and 15-5, may, after arraignment, tender in writing, signed by such person and his counsel, a plea of guilty of such crime; and the State, with the approval of the court, may accept such plea. Upon rejection of such plea, the trial shall be upon the defendant's plea of not guilty, and such tender shall have no legal significance what-

ever. (b) In the event such plea is accepted, the tender and accept-
ance thereof shall have the effect of a jury verdict of guilty of the
crime charged with recommendation by the jury in open court that
the punishment shall be imprisonment for life in the State's prison;
and thereupon, the court shall pronounce judgment that the defend-
ant be imprisoned for life in the State's prison. (c) Unless and until
the State accepts such plea, no reference shall be made in open court
at the time of arraignment or at any other time to the tender or
proposed tender of such plea; and the fact of such tender shall not
be admissible as evidence either for or against the defendant in the
trial or at any other time and place. The defendant shall have the
right to withdraw such plea, without prejudice of any kind, until
such time as it is accepted by the State."

However, by Chapter 117, Session Laws of 1969, the General
Assembly repealed G.S. 15-162.1 effective March 25, 1969. The crime
here involved was committed before the repeal. The effect of the
section has been discussed in a number of our cases. *State v. Peele,*
274 N.C. 106, 161 S.E. 2d 568; *State v. Spence and Williams,* 274
N.C. 536, 164 S.E. 2d 593, and more recently *State v. Atkinson,* 275
N.C. 288.

[1-3]    To become applicable or operative, a defendant and his
counsel were required to file a written plea of guilty which the
prosecution and the court might or might not approve. If the tender
of the plea is not approved "the trial shall be upon the defendant's
plea of not guilty and such tender shall have no legal significance
whatever." It seems the defendant might avail himself of the right
to tender a written plea of guilty but a failure to tender such plea
leaves the section inoperative. The absence of the written plea left
the terms of G.S. 14-17 in full force and effect. The repeal of G.S.
15-162.1 did not modify, change, add to, or take from G.S. 14-17,
under which the indictment here involved was drawn. The verdict
of the jury as returned without a recommendation that the punish-
ment be imprisonment for life required the court to impose the
death sentence. *State v. Atkinson, supra; State v. Spence and Wil-
liams, supra; State v. Forcella,* 52 N.J. 263, 245 A. 2d 181.

[4]    The defendant challenges the sufficiency of the verdict to sup-
port the judgment imposed. After its deliberation, the jury returned
to the courtroom and announced agreement on a verdict and desig-
nated Juror Williams as foreman to speak for the jury. Juror Wil-
liams: "Your honor, we, the jury, find the defendant guilty of
murder in the first degree." The court asked the jury: "With that
verdict do you make any recommendation?" The foreman replied:

"We did not come to that agreement". This means that the jury did not agree to make any recommendation. After further discussion and question whether they made any recommendation, the foreman replied: "We did not". The clerk then said: "Hearken to your verdict, as the Clerk recordeth. You say that Marie Hill is guilty of Murder in the First Degree whereof she stands charged, so say you all?" By the Jury: "Yes." If defendant or counsel had any doubt concerning the unanimity of the jurors in the announced verdict, they should have had the jury polled. *State v. Cephus,* 241 N.C. 562, 86 S.E. 2d 70.

[5]    Review discloses that the court charged fully and correctly with respect to the right of a jury as a part of its verdict to make the recommendation that punishment should be imprisonment for life. Such recommendation would require the court to impose that sentence and no other. In the absence of the recommendation, the court had before it a verdict of guilty of murder in the first degree. The verdict required the court to impose the death sentence. *State v. Atkinson, supra,* and cases therein cited.

In this case the evidence of guilt is overwhelming. The defendant was advised of the charge against her — murder — a serious crime; that she had the right to counsel, to remain silent; and that any admissions she made would be used against her in court. She voluntarily made the admissions heretofore detailed and later, upon the prompting of Virginia Staton, denied them. The following day, when asked by the officers which of her stories was correct, she again admitted the robbery and killing and voluntarily went with the officers to the Strum store and re-enacted the happenings as they occurred on the morning of October 7, 1968.

In response to this question by her attorney, "Did he (Detective Winstead) force you to tell him anything?", she answered, "No, he did not in any way put any pressure on me to confess. I did tell him I wanted to go ahead and tell the truth. I told him I had been in Mr. Strum's store many times before. He knew me and knew what my name was. That was why I shot him. I did tell Mr. Winstead that that was why I did it. I did tell Mr. Winstead that I shot Mr. Strum and pointed out to Mr. Mullen right where I shot him the first time. I did show him exactly where Mr. Strum fell. When we went to the store, I showed Mr. Winstead approximately where I shot Mr. Strum the second time. I did point out where they could find the broken bottle."

From the witness stand, however, she denied the truthfulness of her confession or that she was even in the City of Rocky Mount at

the time Mr. Strum was robbed and murdered. The witnesses by whom she sought to prove an alibi did not impress the jury. In fact, the elaborate and exhaustive briefs filed by counsel for the defendant and, on her behalf by the North Carolina Civil Liberties Union as amicus curiæ, do not discuss guilt or innocence. Counsel do argue, however, the court committed error in permitting the prosecution to introduce in evidence the defendant's confession made to the officers in Kingstree, South Carolina and, after a denial suggested by her friend Virginia Staton at police headquarters in Rocky Mount, but thereafter confirmed by the defendant who voluntarily went to the Strum store and, in the presence of the officers, re-enacted the robbery and shooting of Mr. Strum. The confession and the re-enactment fitted into the picture in such manner that the only logical conclusion is that the narrator must have been present at the time of the holdup. In fact, she pointed out one of the weapons she had used (a bottle) which the officers had failed to discover in their search.

[6]    Counsel contend, because of the defendant's age and immaturity, her confession made in the absence of counsel should have been excluded. It would seem that one who has arrived at the age and condition of accountability for crime may make a valid waiver of counsel, and make a voluntary confession. Defense counsel cite, contra, State v. Thorpe, 274 N.C. 457, 164 S.E. 2d 171. In Thorpe, this Court decided the evidence on the voir dire was insufficient to support a finding Thorpe knowingly and understandably waived his right to counsel at his in custody interrogation which produced the incriminating admissions. This Court ordered a new trial because the admissions were introduced in evidence without a finding (based on evidence) that Thorpe had waived the right to counsel at his in custody interrogation.

[7]    Defense counsel argue the defendant's waiver of a preliminary hearing without counsel was prejudicial. Nothing done or said at the preliminary hearing, which defendant waived without counsel, had bearing on the trial. The trial was based entirely on a Grand Jury indictment returned subsequent to the preliminary hearing. Absence of counsel was non-prejudicial. Gasque v. State, 271 N.C. 323, 156 S.E. 2d 740; State v. Hargett, 255 N.C. 412, 121 S.E. 2d 589; United States ex rel Hughes v. Galt, 271 U.S. 142, 70 L. Ed. 875.

[8]    Defense counsel also argue that the voluntariness of the confession should have been one of the issues submitted to the trial jury. Under North Carolina procedure, voluntariness is a preliminary question to be passed on by the trial judge in the absence of the jury. State v. Vickers, 274 N.C. 311, 163 S.E. 2d 481; State v.

*Gray,* 268 N.C. 69, 150 S.E. 2d 1; *State v. Barnes,* 264 N.C. 517, 142 S.E. 2d 344. This procedure, we think, is approved by the Supreme Court of the United States. In *Jackson v. Denno,* 378 U.S. 368 (Footnote 19), the Court uses this language: ". . . (T)he states are free to allocate functions between the judge and the jury as they see fit."

[9]   Defense counsel argue a new trial should be ordered upon the ground the court failed to charge the jury it might return a verdict of murder in the second degree. It is true that in a case of first degree murder, committed after premeditation and deliberation, a verdict of second degree murder is permissible if the jury should fail to find premeditation and deliberation. However, in a case of murder in the first degree committed in the perpetration of, or attempt to perpetrate, a robbery, instruction that the jury should return a verdict of guilty as charged, guilty as charged with a recommendation for life imprisonment, or not guilty is a proper instruction. When the indictment and evidence disclose a killing in the perpetration of a robbery, only one of such verdicts may be returned. *State v. Linney,* 212 N.C. 739, 194 S.E. 470; *State v. Myers,* 202 N.C. 351. 162 S.E. 764; *State v. Spivey,* 151 N.C. 677. These cases were decided before the passage of the act permitting the jury to recommend life imprisonment. They hold that a verdict of guilty of murder in the first degree, or not guilty, is a proper verdict.

[10]   All the evidence in the case before us shows a killing in the perpetration of a robbery. The court charged the jury: "So, if, upon consideration of the evidence, the State has satisfied you from the evidence and beyond a reasonable doubt that the defendant committed the crime of robbery with firearms against the person of W. E. Strum and during the perpetration or commission of that crime that she killed him with a .25-caliber pistol, then you would return one of two verdicts: either guilty of murder in the first degree, or guilty of murder in the first degree with a recommendation that the prisoner's punishment be imprisonment for life in the State's Prison instead of death. If you have a reasonable doubt as to her guilt, you would return a verdict of not guilty." The charge required proof beyond a reasonable doubt *that the killing was in the perpetration of a robbery.*

[11]   Both in the briefs and in the oral argument, counsel addressed to us a potent appeal to save this girl from the judgment imposed in the trial court. The plea is based on the defendant's tender age, her lack of opportunity, and the tragic family life disclosed in the confession which she wrote (while alone), delivered to the officers, and

which was introduced in evidence and made a part of the record before us. Consideration of an appeal not based on errors of law is beyond judicial competence. Before the law, each individual stands on an equal footing.

[12]    Each member of this Court is required to take an oath that he will administer justice without respect to persons and do equal right to the State and individuals, and perform all duties agreeably to the Constitution and laws of the State. Under the constitutional division of governmental powers, the Legislative Branch makes the laws; the Judicial Branch interprets them; and the Executive Branch executes them. The clear intent of the Constitution is that each of these governmental divisions should confine its activities to its own field. Article III of the North Carolina Constitution, in Section 6, provides that the Governor shall have power to grant reprieves, commutations and pardons after conviction (except in cases of impeachment) upon such conditions as he may think proper (subject to such regulations as may be provided by law relative to the manner of applying for pardons).

[13, 14]    This Court has neither the power to change the law nor to remit the penalty the law exacts for its violation. This Court hears appeals and determines whether the trial court committed prejudicial error of law or legal inference. Hence, appeals for changes in the law should be made to the Legislature; appeals for relief from its penalties after conviction should be made to the Governor.

Error of law or legal inference does not appear in the record before us. In the trial and judgment, we find

No error.

MOORE, J., did not participate in the consideration or decision of this case.

BOBBITT, C.J., and SHARP, J., dissenting as to death sentence.

We vote to vacate the judgment imposing the death sentence. In our opinion, the verdict of guilty of murder in the first degree should be upheld and the cause remanded for pronouncement of a judgment imposing a sentence of life imprisonment.

G.S. 15-162.1, which was in force when defendant was arraigned, tried and convicted, provided that the tender and acceptance of a plea of murder in the first degree, rape, burglary in the first degree, or arson, had the effect of a verdict of guilty of such crime with recommendation by the jury that the punishment be imprisonment for

life in the State's prison; and, in such event, required that the court pronounce a judgment of life imprisonment. If a plea of guilty was tendered by a defendant and accepted by the State, with the approval of the court, the defendant by such plea avoided a jury trial and the possibility of a conviction resulting in a death sentence. G.S. 15-162.1 was repealed March 25, 1969.

It is, and has been, our opinion that, prior to the repeal of G.S. 15-162.1, the death penalty provisions relating to murder in the first degree, rape, burglary in the first degree and arson (G.S. 14-17, G.S. 14-21, G.S. 14-52 and G.S. 14-58, respectively) were invalidated by the decisions of the Supreme Court of the United States in *United States v. Jackson*, 390 U.S. 570, 20 L. ed. 2d 138, 88 S. Ct. 1209 (1968), and in *Pope v. United States*, 392 U.S. 651, 20 L. ed. 2d 1317, 88 S. Ct. 2145 (1968). The reasons for our opinion are set forth fully in the dissenting opinions in *State v. Spence*, 274 N.C. 536, 164 S.E. 2d 593, and in *State v. Atkinson*, 275 N.C. 288, 167 S.E. 2d 241. If our view is correct, North Carolina had no death penalty in December, 1968, when Marie Hill was convicted of murder in the first degree and sentenced to die.

In *Alford v. State of North Carolina*, 405 F. 2d 340, a panel of the United States Court of Appeals for the Fourth Circuit in a split decision (two to one) held the *Jackson* and *Pope* decisions invalidated the death penalty provisions of our North Carolina statutes. The Supreme Court of the United States granted *certiorari* to review the *Alford* case and heard oral arguments therein on November 17, 1969. Its decision may determine whether *Jackson* and *Pope* did invalidate the death penalty provisions of our North Carolina statutes *as they existed* prior to March 25, 1969.

Notwithstanding the repeal of G.S. 15-162.1, uncertainty as to the validity of the death penalty provisions of our North Carolina statutes continues for reasons other than those discussed in *Jackson* and *Pope*. These additional questions may be resolved by the forthcoming decision of the Supreme Court of the United States in the case of *Maxwell v. Bishop*, which was first argued at the Spring Term 1969 and has been set for reargument at the Fall Term 1969. *Maxwell v. Bishop* involves Arkansas statutes containing provisions similar to those in our North Carolina statutes. The Supreme Court in allowing *certiorari* to review the decision of the United States Court of Appeals for the Eighth Circuit (*Maxwell v. Bishop*, 398 F. 2d 138), limited consideration to Questions 2 and 3 of the petition for *certiorari, viz.:*

"2.   Whether Arkansas' practice of permitting the trial jury ab-

solute discretion, uncontrolled by standards or directions of any kind, to impose the death penalty violates the Due Process Clause of the Fourteenth Amendment?

"3.   Whether Arkansas' single-verdict procedure, which requires the jury to determine guilt and punishment simultaneously and a defendant to choose between presenting mitigating evidence on the punishment issue or maintaining his privilege against self-incrimination on the guilt issue, violates the Fifth and Fourteenth Amendments?"

It seems probable that the decision in *Maxwell v. Bishop* will settle existing uncertainty as to the validity of our *present statutory provisions* relating to capital punishment. If it should be determined that the majority of this Court are correct in their view that the death penalty provisions of our statutes were and are valid, we would join in the decision that the verdict and the judgment imposing the death sentence should be upheld.

On the other hand, if it should be determined by the Supreme Court of the United States that the death penalty provisions of our statutes, as of the date defendant was arraigned, tried and convicted, were invalid, either under the decisions in *Jackson* and *Pope* or on grounds that may be decided in *Maxwell v. Bishop,* we would not disturb the verdict but would remand the cause for pronouncement of a judgment imposing a life sentence.

Our statutes provide only two possible judgments, death or life imprisonment, where a defendant is convicted of murder in the first degree, rape, burglary in the first degree, or arson. If the death penalty provisions are invalidated, the only permissible punishment upon conviction for these crimes is life imprisonment. We are not at all impressed with the suggestion that, even if the death penalty provisions are invalidated, no judgment of imprisonment for life can be pronounced unless the jury, at the time of rendering its verdict in open court, recommends that "the punishment shall be imprisonment for life in the State's prison." If the alternative of death is invalidated, there would be no occasion for the jury to do otherwise than render a verdict as to defendant's guilt. The jury would have no discretion as to whether punishment should be death or life imprisonment. Any recommendation the jury might make in respect of punishment would be inappropriate and without legal significance. Upon conviction, the court would impose the only legally permissible punishment, being the statutory punishment most favorable to the defendant, that is a judgment of imprisonment for life.

The retrial of a capital case, which necessarily requires the expenditure of time and money and imposes great stress and strain upon all who are involved in it, should not be undertaken in the present uncertainty concerning these issues of life and death. Nothing will be lost by deferring our decision in this case until the Supreme Court of the United States has spoken definitively on the crucial questions now before it for decision. We favor that course.