STATE OF NORTH CAROLINA v. ROGER VERNON MILLER

No. 14

(Filed 12 June 1970)

**1. Criminal Law § 76— confession — defendant's nervous state — effect on admissibility**

The fact that the defendant became nervous and highly excited during his confession to the sheriff that he kidnapped and strangled a 13-year-old girl does not impeach the confession or reflect upon defendant's ability to make it, and the trial court was not required to make a finding of fact that the defendant was nervous at the time of the confession.

**2. Criminal Law § 112— instructions on reasonable doubt**

The charge of the trial court, when considered contextually, properly placed upon the State the burden of proving beyond a reasonable doubt every essential element of the offenses charged.

**3. Constitutional Law § 29; Criminal Law § 135; Jury § 7— capital case — exclusion of jurors who would never return death penalty**

In a prosecution of a defendant charged with first degree murder, the trial court properly sustained the State's challenge for cause to each juror who stated that in no event and under no circumstances could he render a verdict of guilty against any person, regardless of the evidence, if the punishment was death. U. S. Constitution, Amendments V, VI and XIV; N. C. Constitution, Art. I, § 13.

**4. Criminal Law § 75— admissibility of confession — voluntariness — defendant in jail**

Defendant's confession to the sheriff, which was made while defendant was under arrest for kidnapping and homicide and was confined in jail, held properly admitted in evidence, where there were findings, supported by evidence, that (1) the defendant himself had sought the interview with the sheriff in order to get the crimes "off his chest" and (2) the sheriff gave the defendant the necessary warnings prior to the confession.

**5. Criminal Law § 135; Homicide § 31— validity of death penalty — repeal of G.S. 15-162.1**

The question whether G.S. 14-17 and G.S. 15-162.1, when construed together in the light of U. S. v. Jackson, 390 U.S. 570, will render unenforceable the death penalty for murder in this State held immaterial in this first degree murder prosecution, G.S. 15-162.1 being repealed prior to the commission of the offense.

**6. Statutes § 1— enactment of statute — determination of date — use of Senate journal**

The repeal of the statute providing for a sentence of life imprisonment upon the acceptance of a defendant's guilty plea to a capital crime, G.S. 15-162.1, is held to have antedated by a few hours the commission of a homicide by strangulation, both the repeal of the statute and the homicide occurring on the same day, where it appeared from the Senate journal that, within a few minutes after the beginning of the legislative day at 12 Noon on 25 March 1969, the House bill repealing the statute had been

ratified by the Senate and had been enrolled and sent to the Secretary of State, and where the evidence for the state in the homicide prosecution established that the defendant charged therein had committed the offense sometime after 2:30 p.m. on 25 March 1969.

**7. Statutes § 1— enactment date of statute — admission of evidence as to precise time**

Generally, a statute will be held effective from the first moment of the day of its enactment, although a court will hear evidence and determine the precise moment of enactment whenever it becomes necessary to prevent a wrong or to assert a meritorious right.

**8. Criminal Law § 135;  Homicide § 31;  Constitutional Law § 29— capital case — determination of punishment — recommendation of mercy**

The 1949 amendment to the capital felony statutes providing that the jury, as a part of its guilty verdict, might by recommendation fix the punishment at life imprisonment rather than death, *held* not an unlawful division of powers between the court and the jury.

APPEAL by defendant from jury verdicts of guilty and judgments thereon entered by *Fountain, J.* at the September 8, 1969 Session, DUPLIN Superior Court.

This criminal prosecution was based on the following bill of indictment duly returned by the Grand Jury on May 12, 1969:

"The State of North Carolina

  v                                  INDICTMENT

Roger Vernon Miller

First Count:

THE JURORS FOR THE STATE UPON THEIR OATH PRESENT, That Roger Vernon Miller late of the County of Duplin on the 25th day of March, 1969 with force and arms, at and in the county aforesaid, unlawfully, wilfully, feloniously, forcibly and fraudulently did kidnap Reba Jacquelyn Stone contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State.

Second Count:

AND THE JURORS FOR THE STATE UPON THEIR OATH FURTHER PRESENT, That Roger Vernon Miller, late of the county of Duplin on the 25th day of March, 1969, with force and arms, at and in the county aforesaid, unlawfully, wilfully and feloniously, and of his malice aforethought, did kill and murder Reba Jacquelyn Stone against the form of the stat-

ute· in such case made and ·provided and against the· peace and dignity of the State.

WALTER T. BRITT

Solicitor"

On March 29, 1969 Judge Hubbard of the Fourth Judicial District, on inquiry, found the defendant was in· custody, charged by warrant with the offenses of kidnapping and murder, and that he was indigent and was without counsel. Based on the findings, Judge Hubbard appointed Hubert E. Phillips attorney for the defendant.

After his appointment, Attorney Phillips applied for and obtained an order that trial jurors be drawn from Wayne County. Three writs of venire facias were issued before the twelve regular jurors and one alternate juror were selected and empaneled to try the charges contained in the indictment.

During the jury selection the State was permitted, over defendant's objection, to challenge for cause jurors who testified they had religious or conscientious scruples against capital punishment. for, any crime, and for that reason it would be impossible for them to return, or even consider returning, any verdict of guilty in a capital case, and that in no event and under no circumstances could they render a guilty verdict against any person regardless of the evidence if the punishment was death.

The State's evidence, in short summary, is here reported. On March 25, 1969, Reba Jacquelyn (Jackie) Stone, aged 13, and her two sisters, Robin Elaine, aged 9, and Letha, aged 6, were students attending the junior high and elementary schools at Wallace in Duplin County. Between 2:30 and 3:00, after school was out, the sisters met on the school grounds to go home. Robin Elaine testified: "We came to a parked car on East Hall Street. The man stopped us and· asked Jackie what was her father's name. Jackie said 'Leon W. Stone' and then the man said, 'Your mother has been in a car wreck and she is in the hospital and she wants you to come'. Jackie got in his car. The man then said, (to Letha and me) 'You go on home there is somebody waiting there to take care of you' . . . when I got home my mother was sitting in the house reading." The alarm immediately went out that Jackie had been kidnapped by a man driving a Ford automobile with a white body and a black top.

A number of witnesses testified they saw a white automobile with a black top on the afternoon of March 25 between Wallace and Kenansville, 16 miles to the north. Some witnesses knew the defendant and identified him as the driver of the automobile. Some saw a

female in the vehicle with him as he drove at great speed. Between 3:00 and 3:30, the afternoon of the 25th, one witness saw a white Ford with a black top parked on a bridge over Stocking Head Creek, several miles north of Wallace, in the direction of Kenansville. One witness testified that she saw a man standing beside the vehicle on the bridge over Stocking Head Creek. The man was slender and generally of the defendant's build. The bridge was on a dirt road a short distance off the highway between Wallace and Kenansville.

During the night of March 25, Harry W. Pridgen, a highway patrolman, found the dead body of Jackie Stone in about five feet of water just below the bridge over Stocking Head Creek. The autopsy, performed by a pathologist, disclosed to his satisfaction, and he so testified, that death was caused by manual strangulation and not by drowning. One of Jackie's school books was found in the creek below the bridge.

Each of the Stone girls positively identified the defendant as the man who told Jackie her mother was injured and wanted her to come to the hospital.

T. E. Revelle, Sheriff of Duplin County, was called as a witness for the State. When asked if the defendant had made to him any incriminating statements concerning the death of Jackie Stone, defense counsel objected. Thereupon, Judge Fountain, in the absence of the jury, conducted a voir dire examination. Both the sheriff and the defendant testified at this examination. The sheriff said that the defendant, who was then in jail in Burgaw, the county seat of Pender County, had sent for him to come to the jail. "He sent for me to come down. He said he wanted to talk to me. . . ." Before he permitted the defendant to make any admissions, however, Sheriff Revelle gave him the warnings that he had a right not to talk; that if he did make any admissions they could and would be used against him in any trial; that he was entitled to a lawyer and if he was not able to employ a lawyer one would be selected for him. "(H)e said that he did not want one, that he wanted to get it off his chest." The admissions will be repeated later.

The defendant testified on the voir dire that he had been drinking excessively. He said he recalled the date that Sheriff Revelle came to see him in jail at Burgaw but he didn't remember the sheriff giving him any messages or warnings. He didn't remember the sheriff telling him that he had a right not to talk. On cross examination the defendant said: "I was sober. I knew the sheriff. I asked the sheriff to come down to Burgaw. I wanted to talk to him. I had sent for him. . . . I do remember telling him I wanted to get it off my

chest, that is the reason I sent for him. He made notes of what I told him. I don't remember whether he read it back to me or not. I do remember initialing each page of that. . . ."

At the conclusion of the voir dire, Judge Fountain found facts, among them that proper warnings were given by the sheriff and that no inducements were offered, and that the admissions made to the sheriff were freely, understandingly and voluntarily made and were properly admissible in evidence.

At the trial, Sheriff Revelle testified that he went to the jail on March 26 about 8:30 p.m. and the defendant voluntarily told this story. After describing his loss of sleep on the night of the 24th, he drank a large quantity of beer and drove many miles, part of the time alone, and part of the time with a companion, Milton Maler. He said:

". . . (H)e put Maler out at the depot in Wallace about two-thirty, and then after he put Maler out, he drove down the road toward the schoolhouse, down Railroad Street, and went by the schoolhouse; he said he saw three or four girls walking along the sidewalk and he stopped and asked the largest girl what her father's name was and she told him her daddy's name. He couldn't remember what she had told him her father's name was; he told the oldest girl that her mother had been hurt and in the hospital and her father had sent him after her and told him to take her to the hospital and sent the other girls home, said there was somebody there to look after them.

\* \* \*

He said she got in the car and he proceeded south, down Railroad Street until he got to the Test Farm in Pender County. . . .

\* \* \*

(H)e turned left on the dirt road and as he turned left the girl told him, 'Don't go this way,' and she immediately jumped up and tried to open the door and jump out of the car and he immediately put on the brakes and grabbed her and put her back down in the car and put his hand around her neck and held her down and closed the door and drove on down the dirt road. He followed that 1737 straight on across the bridge of Stocking Head Creek out to Dobson's Chapel Church on Highway 50 and said he crossed Highway 50 and proceeded on down 1737 about a mile to an old house nobody lived in — he said some of his folks used to live there. That she was kicking and screaming and carrying on so he pulled into the driveway and stopped.

He said he told her to be quiet and he would take her home, but she wouldn't, just kept on kicking and carrying on so and he took a grease rag that he had under his seat and put it around her neck and twisted it back of her head and held her down with that and he said pretty soon she relaxed and then he came back down 1737 to Dobson's Chapel and crossed Highway 50 and came back to Stocking Head Creek and stopped in the middle of the bridge and he got out of the car and walked around the car and took her out of the other side — he said she was laying still — he assumed she was dead — so he took her out of the car and threw her into the creek — over the railing of the bridge into the creek and he got back in the car and drove up the road about a quarter of a mile . . . ."

After the State rested, the defendant testified that he did not sleep any; that he went to work at midnight and got off at 8:30 a.m. on the 25th. "I rode about and drank about twelve to fourteen cans of beer before two-thirty that evening. I was loaded and intoxicated. I was drunk and had no sleep. From that point on I don't know what I did." The defendant offered a number of character witnesses who testified to his good character. One, however, testified his character was not very good. On cross examination, the defendant admitted some minor infractions of the law. He was 23 years old.

At the conclusion of the evidence, argument of counsel, and the charge of the court, the jury returned these verdicts: On the first count "guilty of kidnapping"; on the second count "guilty of Murder in the First Degree as charged and make no recommendations". On the first count, the court imposed a sentence of imprisonment for life in the State's prison. On the second count, which charged murder in the first degree, the court imposed a sentence of death by the administration of lethal gas as required by law. From the judgment, the defendant appealed.

*Robert Morgan, Attorney General, Millard R. Rich, Jr., Assistant Attorney General, for the State.*

*H. E. Phillips for the defendant.*

HIGGINS, J.

The defendant, through the diligent attorney appointed to represent him, brings to this Court five assignments of error which he contends warrant a new trial. Assignments of Error (C) and (D) may be dismissed without extensive discussion or citation of authority.

STATE *v.* MILLER

**[1]**    By assignment (C) the defendant contends the court, in the voir dire examination, should have found the defendant was highly nervous at the time he confessed to Sheriff Revelle. Actually, the sheriff testified the defendant became nervous and excited as he described the kidnapping, the strangulation of his victim, and the disposal of her body in Stocking Head Creek. Why should he not have become disturbed and highly excited in the course of repeating and reliving the horrible acts which he had committed? Under such circumstances a feeling of excitement and nervousness neither impeaches his confession nor reflects on his ability to make it. This assignment of error is not sustained.

**[2]**    Assignment of Error (D) refers to the court's charge "on reasonable doubt". The charge as given by Judge Fountain, when considered contextually, as it must be, is full, accurate, complete, and places upon the State the burden of proving beyond a reasonable doubt every essential element of the offenses charged. The charge is free from error. *State v. Hall,* 267 N.C. 90, 147 S.E. 2d 548. Exceptive Assignment (D) is not sustained.

**[3]**    As his first serious challenge to the validity of the trial, the defendant contends the court, by sustaining the State's challenge of jurors for cause, violated his constitutional right to a fair and impartial jury as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and by Article I, Section 13, Constitution of North Carolina. The record before us discloses that only those veniremen were successfully challenged for cause who stated that because of their conscientious scruples against the imposition of the death penalty for crime, it would be impossible for them to render or to consider rendering any verdict of guilty of any offense for which the punishment would be death. Each juror stated "that in no event and under no circumstances could (the juror) render a verdict of guilty against any person regardless of the evidence if the punishment was death". Only after the same or similar statements did the court sustain the State's challenge for cause to any juror. In this respect, Judge Fountain applied a more exacting test than the Supreme Court of the United States intimates would be a proper basis for such challenge. *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776. See also *State v. Spence & Williams,* 274 N.C. 536, 164 S.E. 2d 593; *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241; *State v. Ruth,* 276 N.C. 36, 170 S.E. 2d 897; *State v. Roseboro,* 276 N.C. 185, 171 S.E. 2d 886. The court's rulings sustaining the challenges in the instant case were correct. *Swain v. Alabama,* 380 U.S. 202. The defendant's assignment of error based thereon is not sustained.

**[4]** The defendant contends ' the court committed error in permitting Sheriff Revelle to relate to the jury the confession the defendant made to him while under arrest and while confined in the jail at Burgaw. Specifically, the defendant argues the court should have excluded the confession as involuntary. The contention does not find support in the record. True, the defendant was in jail charged with kidnapping and murder. However, Sheriff Revelle was not seeking to interrogate the defendant. The defendant called the sheriff for his own purpose. Even so, the sheriff gave him the necessary warnings before permitting him to make any disclosure. The defendant himself sought the interview and stated he wanted "to get it off his chest". The admissions appear to have been prompted altogether to relieve the pressure on his conscience by his sense of guilt. Nevertheless, before the sheriff even permitted the defendant to talk about the charges under which he was held, he gave the warnings. Actually the warnings do not appear to have been necessary because the prisoner was not acting under any inducement, force or compulsion, but entirely of his own free will. Judge Fountain, after full hearing, found the statements were freely, understandingly and voluntarily made and admitted them in evidence.

"As a general rule, voluntary admissions of guilt are admissible in evidence in a trial. To render them inadmissible, incriminatory statements must be made under some sort of pressure." *State v. Perry,* 276 N.C. 339, 172 S.E. 2d 541; *Hoffa v. United States,* 385 U.S. 293, 17 L. Ed. 2d 374. In *Hoffa,* the Supreme Court of the United States said: "Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." The evidence of Sheriff Revelle was properly admitted. The exception thereto is not sustained.

**[5, 6]** Finally, the defendant argues that G.S. 14-17 and G.S. 15-162.1, when considered and read together, render unenforcible the death penalty for murder in North Carolina, citing as authority *United States v. Jackson,* 390 U.S. 570. Since the decision in *Jackson,* the members of this Court have not been in agreement on the question whether capital punishment is lawful in North Carolina. See opinions in *State v. Spence & Williams, supra; State v. Atkinson, supra; State v. Hill,* 276 N.C. 1, 170 S.E. 2d 885. In this case, any difference of opinion is rendered immaterial by the repeal of G.S. 15-162.1.

During the 1969 session of the General Assembly, House Bill No. 135, repealing G.S. 15-162.1, was introduced in the House on Feb-

ruary 13, 1969. The bill passed its third and final reading in the House on March 11, 1969, and was then sent to and received by the Senate, where it passed its third and final reading on March 21, 1969, and ordered enrolled. The final formalities incident to enrollment required the presiding officers of the Senate and the House to sign the bill and send it to the Office of the Secretary of State. The Senate Journal shows the Senate convened at 12 Noon on March 25. After the opening prayer, the reading of the Journal was dispensed with, the courtesies of the gallery were extended to a few visitors, and the Chowan College Choir sang two songs, then the enrolling clerk of the Senate reported that a number of bills, included House Bill No 135, (an act to repeal G.S. 15-162.1, relating to a plea of guilty in first degree murder, first degree burglary, arson, and rape) had been properly ratified, enrolled, and sent to the Secretary of State. The bill provided that it should become effective upon its ratification.

While a record of the time is not noted when each act of the Senate occurred during the legislative day, nevertheless the Journal reports the activities in the order in which they occurred. It seems certain, therefore, the report that House Bill No. 135 had been ratified, enrolled and sent to the Office of the Secretary of State was made in the Senate within a few minutes after the legislative day began at 12 Noon, March 25, 1969. The repeal of G.S. 15-162.1 antedated the offenses charged against the defendant.

[7]    In determining the time a statute becomes effective, the rule was stated by Justice Hoke in *Lloyd v. Railroad*, 151 N.C. 536, 66 S.E. 604: "The better doctrine seems to be that, while a court will hear evidence and determine the precise moment of time when a statute was enacted, whenever this becomes necessary to prevent a wrong or to assert a meritorious right, in the absence of any such evidence or means of proof the statute will be held effective from the first moment of the day of its enactment. Mr. Bishop, in his work on Statutory Crimes, states this to be the rule. Bishop Stat. Crimes, p. 21, sec. 28. And an examination will show this to be a correct deduction from the decisions. *Louisville v. Bank*, 104 U.S., 469; *Burgess v. Salmon*, 97 U.S., 381; *Lapeyne v. United States*, 84 U.S., 191; *Kennedy v. Palmer*, 72 U.S., 316; *Arrow v. Hamering*, 39 Ohio St., 573."

Five of this Court's members entertain the view that the infliction of the death penalty prior to the repeal of G.S. 15-162.1 is not precluded by the decision in *United States v. Jackson, supra.* At least the repeal of G.S. 15-162.1 would seem to remove all objection to the validity of the death sentence on account of G.S. 15-162.1. See also

*Parker v. State of North Carolina,* No. 268, October Term, 1969; *Brady v. United States,* No. 270, October Term, 1969, both decided by the Supreme Court of the United States on May 4, 1970.

[8]    In 1949, the General Assembly amended the capital felony statutes providing that the jury, as a part of its guilty verdict, might by recommendation fix the punishment at life imprisonment rather than death. The amendment is not an unlawful division of the powers between the court and the jury, and a verdict without the recommendation requires the infliction of the death penalty. *State v. Hill, supra; State v. Atkinson, supra.* In *Jackson v. Denno,* 378 U.S. 368, in Footnote 19, the Supreme Court of the United States said: "(T)he states are free to allocate functions between the judge and the jury as they see fit."

After full and careful review, we conclude that the defendant has had a trial free from error; that the judgment imposed should be and is affirmed. In the record, we find

No error.