STATE OF NORTH CAROLINA v. MITCHELL GRANT WALTERS

No. 32

(Filed 19 November 1969)

1. Homicide § 15; Criminal Law § 73— relevancy of evidence — explanation of possession of pistol — hearsay

In a prosecution charging defendant, a policeman by occupation, with murder in the first degree committed by use of a pistol, defendant's testimony, offered in explanation of his possession of the pistol at a time when he was not on duty, that he was instructed at the Institute of Government with respect to the right of off-duty peace officers to be armed, *held* properly excluded as hearsay.

2. Homicide § 21— first-degree murder — premeditation and deliberation — sufficiency of evidence

In a prosecution for murder in the first degree, there was substantial evidence of premeditation and deliberation on the part of defendant to withstand motion for nonsuit, where the State offered testimony that on the day of the homicide the defendant, asserting that the deceased had been following his wife, sought the deceased at the latter's filling station and home; that the defendant stated to deceased's wife that he did not like deceased, that what deceased needed was a bullet in the right place and that he, the defendant, might be the one to do it; that later on the same day the defendant, finding deceased at the filling station, provoked an altercation with deceased, first by language, then by threatened assault with handcuffs; that the deceased picked up a tire tool; that

defendant then shot deceased in the leg with a pistol and, when deceased fell, shot him again in the chest; that defendant then turned to an observer and stated that "it was self-defense."

**3. Criminal Law §§ 103, 104—  functions of court and jury — consideration of evidence**

What is evidence is a question of law for the court; what the evidence proves or fails to prove is a question of fact for the jury.

**4. Homicide § 21—  first-degree murder — motion to nonsuit — evidence of premeditation and deliberation**

On motion to nonsuit in a first-degree murder prosecution, the trial court must determine the preliminary question whether the evidence, in the light most favorable to the State, is sufficient to permit the jury to make a legitimate inference and finding that defendant, after premeditation and deliberation, formed a fixed purpose to kill and thereafter accomplished the purpose.

**5. Homicide § 4—  first-degree murder — premeditation and deliberation — length of time**

No fixed length of time is required for the mental processes of premeditation and deliberation constituting an element of the offense of murder in the first degree, and it is sufficient if these processes occur prior to, and not simultaneously with, the killing.

**6. Homicide § 18—  premeditation and deliberation — proof by circumstantial evidence**

Premeditation and deliberation are not usually susceptible of direct proof, and are therefore suspectible of proof by circumstances from which the facts sought to be proved may be inferred.

**7. Homicide § 18—  premeditation and deliberation — proof — circumstances**

In determining whether a killing was with premeditation and deliberation, the circumstances to be considered include: (1) want of provocation on the part of deceased; (2) the conduct of defendant before and after the killing; (3) threats and declarations of defendant before and during the course of the occurrence giving rise to the death of deceased; and (4) the dealing of lethal blows after deceased has been felled and rendered helpless.

Appeal by defendant from *Hall, J.,* May, 1968 Regular Session, Robeson Superior Court.

This criminal prosecution was based upon a Grand Jury indictment, proper in form, which charged the defendant, Mitchell Grant Walters, with the first degree murder of Horace Tillman Britt. The offense is alleged to have occurred on November 10, 1968. Upon arraignment, the defendant entered a plea of not guilty.

At the trial, the State introduced evidence which disclosed the following: On and prior to Sunday, November 10, 1968, the de-

ceased, Horace Tillman Britt, owned and operated a filling station in the Town of Lumberton. Robert Britt, brother of the deceased, testified that the defendant, a Lumberton police officer, off duty, came to the filling station about 1:30 p.m. while Horace was out for lunch. "He came in at one-thirty and wanted to know if my brother was there, and asked if my brother was drinking. I told him, no. I asked him why. He said my brother had been following his wife. I said, 'I don't believe it.' He asked if Horace was drinking. I told him, No. . . . (H)e said the s. o. b. would be better off if he was."

About 2:30 in the afternoon, the defendant, by telephone, called Mrs. Beulah Watts Britt, wife of the deceased. She testified: "The 'phone rang. I said, 'Hello.' He said, 'This is Mitchell'. He asked me if Horace was home. I said, No, he is not; might be at the station, and asked him if he had checked at the station. He said, 'Yes, I have already been down there.' He said, 'Beulah, is Horace drinking today?' I said, 'No, Mitchell, Horace doesn't drink; I said, 'Why?' He said: 'Barbara seems to think Horace has been following her down town and motioning like he wanted her to follow him off some place.' Then he said he was tired of Horace and Robert squealing tires up and down the street and something ought to be done about it. Robert is Horace's brother. He said he didn't like Horace anyway; what he needed was a bullet, in the right place; he said he may well be the one to do it."

The State's evidence further disclosed that Horace Britt was 40 years old, was 5'10-11" tall and weighed more than 200 pounds. Mrs. Britt testified: "On the tenth of November, 1968, he was partially paralyzed in his right side. His leg and I would say his whole right side was affected by that paralysis. He had a limitation or restriction of use of his right arm." He had been injured in a motorcycle accident. The evidence disclosed that on the day of the shooting Horace Britt worked at the filling station. He went home for lunch and for supper in the early evening, then returned to the station.

An eye witness, Melton Lowry, who was an employee of the deceased, testified: "I was there when Mr. Britt returned to the station about five o'clock. I saw Mr. Mitchell Walters at the service station after Mr. Britt returned. When Mr. Mitchell Walters came to the service station after Mr. Britt returned, Mr. Britt and I were both behind the counter. * * * When Mr. Britt and Mr. Walters were both at the cash register, Mr. Britt was behind the cash register and Mr. Walters in front of it; they were three or three and a half feet apart. At that time Mr. Walters was dressed in regular

civilian clothes and did not have on a coat. I heard a conversation between Mr. Britt and Mr. Walters. I can't remember who spoke first. . . . They greeted each other as near as I can recall, and Mr. Walters was first to speak. As close as I remember he was talking to Mr. Britt and said 'What did you mean following my wife around?' Mr. Britt said, I have not been following your wife around; have been to Fayetteville part of the day. Mr. Walters said, 'You are lying. My wife said you have been following her around.' . . . Mr. Britt had to walk behind me to get to the end of the counter; as he was walking toward the end of the counter . . . he said, 'You call me a liar; anybody that calls me a liar,' and was mumbling. When Mr. Britt started walking toward the end of the counter he moved up directly in front of me — Mr. Walters did. He pulled a pair of handcuffs and put them up to his shoulder. At the time he held the handcuffs up to his shoulder Horace Britt did not have any kind of weapon in his hand that I saw. * * * When Mr. Walters pulled his handcuffs and held them up in that manner Mr. Britt moved back like this, spread out his right foot to pick up a tire tool. The tool was two yards from the southeast corner of the building. When Mr. Britt reached to pick up the tire tool Mr. Walters moved up to the end of the counter on the front side of the bread rack. At the end of the counter at the bread rack Mr. Walters was within hand reach to the front door. I saw Mr. Britt pick up the tire tool and he swung his right leg around, with a large swing, still in a stooped position, slightly stooped. * * * He had the tire tool in his right hand. When Mr. Britt picked up the tire tool and swung around all my attention was on Mr. Walters; and just as he turned around with the tire tool, I heard two shots back of me. When the first shot was fired Mr. Britt faltered, slumped over and then fell over on his side. Less than a second elapsed between the two shots. When Mr. Walters walked out to the end of the counter just as Mr. Britt was picking up the tire tool, Mr. Walters took a step and a half forward. . . . Mr. Walters was right in front of me. The step or more was in a forward direction and that is in the direction that Mr. Britt was picking up the tire tool. * * * At the time of the shooting there was no one between Mr. Walters and the front door. From the time Mr. Britt picked up the tire tool until after the shooting Mr. Walters was not more than an arm's reach from the door. After the first shot was fired Mr. Britt did not move in any direction other than falling; stopped and fell over. I saw where he fell."

The State introduced the testimony of a medical expert who stated he examined the body of the deceased at the hospital, found

a gunshot wound had passed through his right leg, and another entered between the 4th and 5th ribs near the heart and lodged under the skin below the hip bone. The last shot, in the opinion of the doctor, caused death.

At the close of the State's evidence, the defendant moved for a directed verdict of not guilty on the capital felony charged in the indictment. The motion was overruled. The defendant excepted.

The defendant introduced the evidence of a witness who testified she was entering the filling station at the time of the shooting. She testified that Horace Britt was moving toward the defendant; that two shots were fired but the deceased did not fall until after the second shot; that the witness saw a tire tool at or near the deceased after he fell. The defendant also introduced a number of witnesses who testified that Horace Britt had the reputation of being a violent and dangerous man.

The defendant's wife, Mrs. Barbara Walters, testified: "When I passed the station the middle of the day on which he was killed I saw Horace pull out of the station as I went by. He waved and I waved back, usual greeting. . . . When I drove through town he stayed behind me. He was doing like this; he was moving his hand from the front over to the right. It was his left hand. He would blow the horn and would do this. I do not know what he was saying. I did not know if he was trying to take me off, but he had no business doing it. I did not see the purpose of keeping blowing the horn. * * * I came to the conclusion I didn't know why he was doing that and I was frightened. . . . I turned to the left at Fifth Street and when I got to the stoplight, it was red. He stopped behind me and blew the horn for me to turn left. I turned left and when I got to Walnut and Sixth I do not remember stopping — the light was green. . . . He was still following and motioning left when I got to the jail. I thought that meant for me to turn. * * * When I got to Elm and Elizabethtown Road I do not remember stopping at that light; it must have been green. . . . I stopped at Pine and Elizabethtown Road and Eleventh Street and he stopped and blew his horn and motioned for me to turn left. I did not turn left there, but turned right. He turned left and went on down the street . . ." The defendant and the deceased lived within two blocks of each other.

The defendant testified that when his wife returned from the drugstore with the paper, she was upset. "As to my wife's condition, she was frightened. She did relate to me what had happened. . . . As a result of what she told me I went to the kitchen and made a

telephone call to Mrs. Beulah Britt, the wife of Horace Britt. . . .
* * * When I called Mrs. Britt she answered the telephone.
. . . I asked her if Horace was home. She said, No. I asked her
if she knew where he was; she said, No. I then asked her if Horace
was drinking. She said, not that she knew of, but he could be. She
wanted to know why — I told her Horace had followed my wife,.
had blown the horn at her and made these gestures as he followed
her; had my wife upset and afraid. * * * I told her I didn't like
what Horace had done. I told her that he and Robert did a lot of
fast driving and spinning tires; that I had never indicted them for
I didn't want any trouble out of them, that they were neighbors.
. . . (S)he said she didn't want us to have any trouble. I as-
sured her there wouldn't be any trouble, the worst thing that could'
happen between us, I might slap his face." The witness denied mak-
ing any threat or suggestion of shooting. The defendant admitted'
going to the filling station and having a conversation with Robert
Britt about 1:30 p.m. "I told him that Horace had frightened my
wife. . . . * * * I did not make any statement about the brother
of Robert Britt being an s. o. b. and there was no profane language
in the conversation. . . ."

The defendant testified that later on he drove by the service
station, saw Horace Britt's car and stopped. "When I went in he
said, 'Hello, Mitchell.' I said, 'Hello, Horace.' He then asked what.
he could do for me. I asked Horace, 'What do you mean by follow-
ing my wife?' He said, 'I have not followed your wife.' I said: 'My
wife says you have.' He said, 'Your wife is a damn liar.' I said: 'You
are a damn liar.' He then became very angry and rushed from be-°
hind a counter and as he walked rapidly, started trying to get a blue
jacket off him. At that time I did not have anything in my hands.
Horace was well over six feet tall. . . . (A)s he came around the
counter and stood in front of the counter, facing me, I took hand-
cuffs out and held them down by my side. I had the handcuffs and a
weapon with me then — the weapon was in the right front pocket,
of my trousers. * * * When he put his jacket back across his
shoulders he weaved around rapidly, took several steps toward the
southeast corner of the service station. I was not doing anything at.
the time. * * * When he went rapidly toward the southeast.
corner of the station, it took him a split second or two to pick up the
tire tool, a very short time. When he picked up the tire tool he
wheeled back around and had it in his right hand, drawn back like
this. I don't know how far he was from me when he turned back
toward me. I would have to guess. Approximately twelve or thirteen
feet, I don't know. After he turned back to me, he rushed very

rapidly toward me. * * * (A)s he rushed rapidly toward me, I put my handcuffs up and took out my revolver. At that time I shouted, 'Horace, stop' or 'Horace, don't,' one of the two. When he continued to advance I had my revolver in my hand; I pointed my revolver toward his right thigh, right leg, and pulled the trigger. The gun did fire and Horace continued on toward me. I then raised by revolver higher and fired another shot. At the time I fired the first shot he still had the revolver [sic] drawn back in his right hand. At the time I fired the second shot it was still in his right hand lifted up. After the second shot Horace fell to the floor."

By way of explaining the possession of a pistol on Sunday, and while he was off duty, the defendant testified: "I did not take my weapon with me primarily because I was afraid of him. I took it for several reasons. I had not anticipated any trouble. I took my pistol because as a police officer, I was allowed and advised to carry a gun off duty. I did it also as a form of self protection and it had become a habit. It was customary for me to take the revolver with me when I left the premises and my house. I was a policeman off duty and felt if I should observe the commission of some felony or unlawful act, if in civilian clothes it was my duty to try to make an arrest or intervene to prevent possible injury. I discussed that with the Chief of Police, Mr. Lovette. I think he knew I was going to do it. I did not discuss directly with Mr. Lovette carrying my weapon while I was off duty. He is chief of police and was my immediate superior at the time. He has told me that I was allowed by law to take it when off duty and has told several more when I have been in the group when the chief said it. * * * I was permitted to carry a weapon when off duty and was instructed in school. That is part of the reason I carried a gun or pistol, that I was allowed by law to carry it. Plain clothes officers, deputy sheriffs and highway patrolmen also carry guns off duty. One reason I carried it was to be prepared in case of a felony that was committed in my presence. I was conscientious as a police officer."

A number of witnesses testifying for the defense said that Horace Britt had a bad reputation for violence and was considered dangerous. The Chief of Police of Lumberton testified that according to the rules of the police department, a policeman is on duty at all times, subject to call. When not on duty, the members of the force are permitted to carry their weapons. However, it is optional and not mandatory.

In rebuttal, Mrs. Britt testified that the defendant, in his telephone conversation with her, stated he knew Horace had a gun and he had one, too.

The jury returned as its verdict "guilty of the charge of murder in the first degree, with recommendation of life imprisonment." A poll of the jury verified the verdict. From the judgment of imprisonment for life, the defendant appealed.

*Robert Morgan, Attorney General; Ralph Moody, Deputy Attorney General; Andrew A. Vanore, Jr., Staff Attorney; Burley B. Mitchell, Jr., Staff Attorney, for the State.*

*Joe Hill Barrington; Nance, Collier, Singleton, Kirkman & Herndon by James R. Nance, for the defendant.*

Higgins, J.

· The tragedy described by the evidence may have had its inception in the misconduct of the deceased in making improper advances to the defendant's wife by following her automobile, blowing his horn, and making signs which she construed as an invitation for her "to follow him off some place". On the other hand, Mrs. Walters may have misconstrued the conduct of the deceased. As she passed his filling station on her way home from the drugstore, the deceased left the station and entered the street behind her as she drove by. She was on her way home. He probably was on his way home for lunch. They lived within two blocks ·of each other. His way home, and hers, would naturally be the same except for the last few blocks. That Mrs. Walters may have misconstrued the conduct of the deceased would not necessarily affect the defendant's reaction to it. She was frightened and upset. Her conclusions were that the intentions of the deceased were improper. However, if his actions and intentions were misconstrued, his reaction would not be concilliatory when accused by the armed husband, and upon his denial, called a liar. The deceased's side of the story must remain untold.

[1] The defendant contends the court, in the trial, committed errors in the exclusion of evidence which were sufficiently prejudicial to entitle him to a new trial. By way of explaining his possession of the pistol on Sunday, and while he was out of uniform and off duty, he called the Chief of Police who testified that police officers were subject to call at all times and while off duty were permitted, but not required, to carry their arms. The defendant testified it was his habit to carry his arms at all times. He undertook to testify as to the teachings of the Institute of Government with respect to the right of peace officers to be armed while off duty. The trial court excluded the evidence apparently on the ground it vio-

lated the hearsay rule. *State v. Lassiter*, 191 N.C. 210; *State v. Reid*, 178 N.C. 745. What the defendant understood to be the teachings of some unidentified instructor could add little, if anything, to the rules of the Lumberton Police Department, of which he was a member. The defendant had the benefit of the rule which permitted him to go armed when off duty, at his option.

As to the right of the defendant to be armed, we may assume that Judge Hall instructed the jury fully and correctly. The court's charge is not a part of the case on appeal. The defendant's counsel omitted it from our view. At the time of the difficulty, the defendant did not claim to be acting as an officer, but as he said, "one citizen to another". The exclusion of teachings at the Institute of Government cannot be held to be prejudicial error. The other assignments of error based on the admission or exclusion of evidence have been examined and have been found to be without merit. Likewise without merit is the objection the court permitted the State to offer rebuttal evidence after the defense had rested.

**[2, 3]** The main thrust of the defendant's objection to the trial is directed to the court's action in submitting to the jury the issue of murder in the first degree. Specifically, the defendant contends the evidence was insufficient to show premeditation and deliberation and the court should have withdrawn the capital charge from the jury. What is evidence is a question of law for the court. What the evidence proves or fails to prove is a question of fact for the jury. The court decides competency; the jury decides weight. *State v. Stephens*, 244 N.C. 380, 93 S.E. 2d 431, and many cases cited.

**[4, 5]** In order properly to fulfill its duty, the trial court must determine the preliminary question whether the evidence, in its light most favorable to the State, is sufficient to permit the jury to make a legitimate inference and finding that the defendant, after premeditation and deliberation, formed a fixed purpose to kill and thereafter accomplished the purpose. "No fixed length of time is required for the mental processes of premeditation and deliberation constituting an element of the offense of murder in the first degree, and it is sufficient if these processes occur prior to, and not simultaneously with, the killing." Strong's N. C. Index, 2d Ed., Vol. 4, p. 196 (see Homicide, Murder in the First Degree, Premeditated and Deliberate).

**[6, 7]** Premeditation and deliberation are not usually susceptible of direct proof, and are therefore susceptible of proof by circumstances from which the facts sought to be proved may be inferred. *State v. Watson*, 222 N.C. 672, 24 S.E. 2d 540; *State v. Evans*, 198

N.C. 82. "Among the circumstances to be considered in determining whether a killing was with premeditation and deliberation are: Want of provocation on the part of deceased. *State v. Matheson,* 225 N.C. 109, 111, 33 S.E. 2d 590; *State v. Hammonds,* 216 N.C. 67, 75, 3 S.E. 2d 439; *State v. Buffkin,* 209 N.C. 117, 126, 183 S.E. 543. The conduct of defendant before and after the killing. *State v. Lamm,* 232 N.C. 402, 406, 61 S.E. 2d 188; *State v. Chavis,* 231 N.C. 307, 311, 56 S.E. 2d 678; *State v. Harris,* 223 N.C. 697, 701, 28 S.E. 2d 232. Threats and declarations of defendant before and during the course of the occurrence giving rise to the death of deceased. *State v. Dockery,* 238 N.C. 222, 224, 77 S.E. 2d 664; *State v. Hudson,* 218 N.C. 219, 230, 10 S.E. 2d 730; *State v. Hawkins,* 214 N.C. 326, 331, 199 S.E. 284; *State v. Bowser, supra* (214 N.C. 249, 199 S.E. 31). The dealing of lethal blows after deceased has been felled and rendered helpless. *State v. Artis,* 227 N.C. 371, 373, 42 S.E. 2d 409; *State v. Taylor,* 213 N.C. 521, 523, 196 S.E. 832." *State v. Faust,* 254 N.C. 101, 118 S.E. 2d 769.

[2] The question of law before the trial judge and now before us on appeal is this: Was the evidence sufficient to permit a legitimate inference the defendant, after premeditation and deliberation, intentionally shot and killed Horace Britt? On this subject, Robert Britt testified that about 1:30 on the fatal day the defendant came to the filling station. "He said my brother had been following his wife. He asked if Horace was there and whether he was drinking. I told him no. He said the s. o. b. would be better off if he was." Mrs. Britt testified that between 2:30 and 3:00 the defendant called her over the phone and asked her if Horace was there. On being told that he might be at the filling station, the defendant said he had already been there. The defendant stated "Barbara thinks Horace has been following her and motioning like he wanted her to follow him off some place". He said he did not like Horace anyway; that what he needed was a bullet in the right place; that he may well be the one to do it. Later the same day, after 5:00, the defendant came to the filling station where the witness Lowry and the deceased were checking their accounts. The defendant provked an altercation first by language, then by threatened assault with a pair of handcuffs, whereupon the deceased reacted by picking up a tire tool. The defendant then shot him first in the leg and when he fell fired the fatal shot while he was down. The course of the bullet corroborates Lowry's' evidence.

The defense, by its evidence, featured the size, as well as the violent and dangerous character of the deceased. The defendant,

on cross examination with respect to the threats, said he did not precisely say that he might get mad enough to slap Horace in the face. He said there would not be any trouble between them as the worst possible thing he could do was to slap his face. When an armed and angry man enters the place of business where the owner, a dangerous and violent man, is at work and calls him a liar, he may expect some unfavorable reaction. Does not the defendant's attitude, together with his threats and efforts to come to grips with the deceased, permit a legitimate inference the defendant planned to provoke the deceased into some aggressive action and then shoot him down before he could defend himself? After the two shots were fired and Horace Britt was down, according to the witness Lowry, the first thing he remembers Walters saying was "It was self-defense". Lowry testified, "The first thing I remember, Mr. Walters said, it was self-defense, looked at me and said, 'You saw it.' I said, yes; you drew the handcuffs first."

The evidence makes out an aggravated case of murder in the second degree. There was enough evidence, however, of murder in the first degree to require the court to submit that issue to the jury and to sustain its verdict. The "self-defense" proclaimed by the defendant, while the smoking pistol was still in his hand, may have caused the jury to believe self-defense was a part of the plan from the beginning of the controversy. The evidence permits the inference the defendant was the aggressor and advanced to the attack at all stages of the controversy. According to the evidence, the defendant, beginning before two o'clock, was seeking the confrontation until it culminated at five o'clock in the fatal shooting.

The trial court concluded as a matter of law that the evidence of premeditation and deliberation was sufficient to take the case to the jury and to sustain the verdict. In the trial and judgment we find

No error.