STATE OF NORTH CAROLINA v. ROBERT LOUIS ROSEBORO

No. 25

(Filed 30 January 1970)

1. **Constitutional Law § 29; Grand Jury § 3— motion to quash indictment — systematic exclusion of members of defendant's economic class and race**

In this first degree murder prosecution, the trial court did not err in the denial of defendant's motion to quash the indictment on the ground that persons of defendant's economic class and race were systematically excluded from the grand jury which returned the indictment, where approximately 50% of its members were of defendant's race, and there was no evidence with respect to the economic status of members of the grand jury or of the defendant other than the evidence and finding that all members of the grand jury were employed except one who was retired.

2. **Constitutional Law § 29; Jury § 7— jury selection — constitutionality**

In this prosecution for first degree murder, the record fails to disclose any violation of defendant's constitutional rights in the selection of the trial jury where the court, pursuant to G.S. 9-12, ordered that a jury be summoned from an adjoining county, and upon defendant's challenge to the array, the court conducted a detailed inquiry and found upon proper evidence that the special veniremen were impartially selected from a properly compiled jury list, the court permitted attorneys for both the State and the defendant to explore in detail the background and fitness of each venireman to serve on the jury, and the court overruled challenges for cause by the State to those who opposed capital punishment, and by defendant to those who favored capital punishment, if the venireman stated he could hear the evidence, the arguments of counsel, the charge of the court, consider all permissible verdicts, and return a verdict based on the evidence and the law as defined by the court.

3. **Homicide § 21— first degree murder — sufficiency of evidence**

In this prosecution for first degree murder, the State's evidence *is held* sufficient to permit a jury finding that defendant did the killing with malice, after premeditation and deliberation, and in the perpetration or attempt to perpetrate a felony, where it tends to show that the victim's nude body was found on the floor of her shop, that she had four penetrating stab wounds in the chest, one in the abdomen, and numerous head wounds, that her death was caused by the stab wounds in the chest, that defendant was discovered in the shop armed with a pistol and attempting to hide, that when he was forced out by tear gas, defendant had in his pocket the victim's keys to the store doors and to the cash register and the victim's cigarette lighter, that he had blood on his clothing, that the victim's clothes were found in disarray on the floor of the store's bathroom, and that sun glasses which defendant had bought less than two hours before and a knife similar to the one defendant was seen carrying three days before were with the clothes.

4. **Homicide § 6— manslaughter defined**

Manslaughter is the unlawful killing of a human being without malice,

express or implied, without premeditation and deliberation, and without the intention to kill or to inflict serious bodily injury.

**5. Homicide § 30— first-degree murder — necessity for instructions on manslaughter**

In this first degree murder prosecution wherein the State's evidence tended to show a killing with malice, after premeditation and deliberation, and in the perpetration or attempt to perpetrate a felony, and defendant offered no evidence, the trial court did not err in failing to charge the jury that it might return a verdict of guilty of manslaughter.

**6. Criminal Law § 135— jury finding of guilt in capital case — sentence**

Where the jury, after finding guilt of a capital felony, returns as a part of its verdict a recommendation that the punishment shall be imprisonment for life in the State's prison, the court must impose the life sentence and no other; absent a recommendation, the court must impose the death sentence.

**7. Constitutional Law § 30; Criminal Law §§ 135, 138— capital case — jury recommendation as to punishment — constitutionality**

After guilt in a capital case has been established by the jury, its recommendation as to punishment does not violate the defendant's constitutional rights.

**8. Constitutional Law § 30; Criminal Law §§ 135, 138— capital case — jury recommendation of life imprisonment — lack of standard**

Provision of G.S. 14-17 which permits the jury to recommend life imprisonment for first degree murder is not unconstitutional in failing to prescribe any standard or rule to govern the jury in determining whether to make a recommendation.

**9. Criminal Law § 135; Constitutional Law §§ 29, 30— death penalty for first-degree murder — constitutionality — former statute allowing guilty plea**

The case of *United States v. Jackson*, 390 U.S. 570, is not authority for holding that capital punishment for first degree murder was abolished in North Carolina by [former] G.S. 15-162.1, which, prior to its repeal by the 1969 Legislature, permitted a defendant to tender a written plea of guilty to a capital charge and provided that if such plea were accepted by the State and approved by the court, the tender and acceptance had the effect of a jury verdict of guilty with a recommendation of life imprisonment.

**10. Criminal Law § 146— appeal from death sentence — questions not involving matters of law**

In this appeal from a sentence of death imposed on a sixteen year old defendant, the Supreme Court cannot consider questions and arguments based on defendant's age which do not involve matters of law or legal inference, defendant having offered no evidence indicating or suggesting lack of legal responsibility for his criminal acts.

**11. Criminal Law § 146; Constitutional Law § 10— powers of Supreme Court**

The Supreme Court hears appeals and determines whether the trial court committed prejudicial error of law or legal inference, but the Court has neither the power to change the law nor to remit the penalty the law exacts after conviction.

**12. Constitutional Law §§ 6, 9; Criminal Law § 138— legislative and executive powers — punishment for crime**

Appeals for changes in the law should be made to the Legislature; appeals for relief from its penalties after conviction should be made to the Governor.

BOBBITT, C.J., and SHARP, J., dissenting as to death sentence.

APPEAL by defendant from *Thornburg, S.J.,* April 28, 1969 Session, CLEVELAND Superior Court.

In this criminal prosecution the defendant, Robert Louis Roseboro, was indicted for the first degree murder of Mary Helen Kendrick Williams. The bill of indictment, proper in form, charged the killing occurred in Cleveland County on June 22, 1968.

Immediately after the indictment was returned, the court, upon inquiry, found the defendant to be indigent, and appointed attorney Horace Kennedy to represent him.

At the October Session of the court, the defendant, by petition, requested that attorney Kennedy be released as defense counsel and that Julius Chambers of Charlotte be appointed in his stead. The court granted the motion to relieve attorney Kennedy and to substitute attorney Chambers. Mr. Chambers filed a motion for continuance and for an order that the prosecution be required to disclose and make available to the defendant evidence in the possession and control of the State, including a list of all prospective State's witnesses. In response to the motion, the court entered this order:

". . . (T)hat the State shall make available to the defendant for inspection and copying the evidence now in the possession of the State; that the State shall further make available to the defendant prospective State's witnesses for the purpose of interview, and the State shall advise said witnesses that defense counsel has the right to interview them and that the State shall further make available police reports and statements of witnesses pertaining to defendant's case."

By consent, the case was continued a number of times. However, at the March, 1969 Session, the defendant filed a written motion to

quash the indictment. In summary, these are the grounds for the motion: (1) That persons of the defendant's economic class and race were systematically excluded from the grand jury which returned the indictment; (2) That G.S. 14-17 under which the defendant was indicted is unconstitutional in that it provides the death penalty upon conviction, but gives the jury the right to recommend life imprisonment without fixing any standards or rules to govern the exercise of the right; (3) That G.S. 15-162.1, in effect at the time of the offense (but repealed before trial), placed an unconstitutional burden on the defendant and chilled his right to plead not guilty and to have a jury trial as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States; (4) That the capital charge provided by G.S. 14-17, absent a jury recommendation of life imprisonment, requires a death sentence which is cruel and unusual punishment, forbidden by the Constitution of the United States.

The court conducted a full inquiry into the manner of selecting the Cleveland County grand jury which returned the indictment. The court found, upon competent evidence:

"12. That at no time in making up the list of prospective jurors was any consideration given to the race, creed, color, or economic status of any person whose name appeared on said list; that no discrimination on any basis appeared to exist in obtaining names for the jury list; that no discrimination of any kind was practiced in obtaining said list;

13. That the jury commission in preparing the list used the tax list of the county and the voter registration records as required by law but did not deem it necessary or desirable to seek any other sources of names;

14. That Grady McArter, Chairman of the Grand Jury that issued the indictment against the defendant remembered the makeup of the Grand Jury to be approximately half black and half white, but recalled only one member of the Grand Jury to be unemployed, he being retired and previously employed."

The court concluded:

"2. That the grand jury which indicted the defendant, Robert Louis Roseboro, was properly constituted;

3. That the bill of indictment returned by the grand jury against the defendant, Robert Louis Roseboro, is valid and proper in all respects. . . ."

At the March 6, 1969 Session, the defendant filed a motion to

remove the cause from Cleveland County upon the alleged ground the defendant could not obtain a fair trial either in Cleveland, where the bill was returned, or in the adjoining county of Gaston or Rutherford because of the unfavorable and wide-spread publicity. In lieu of the request to remove the cause to a county other than Gaston or Rutherford, the court, as provided in G.S. 9-12, ordered that a trial jury be summoned from the adjoining county of Burke.

One original and two additional writs of venire facias were required before the trial jury, consisting of twelve regular jurors and one alternate, was empaneled. The defendant filed a challenge to the return of each writ upon the ground that members of his economic class and race were arbitrarily and systematically excluded. Judge Thornburg conducted another hearing and at its conclusion found the challenges were not sustained and that the method of preparing the jury list and drawing the names was not in violation of the defendant's rights. Evidence supported the findings.

The actual selection of the trial jury proceeded according to the North Carolina custom and practice. Each venireman was called and sworn to make true answers to the questions asked by the court or by anyone under its direction touching his fitness to serve as a juror. First the State, then the defendant, and finally the court, proceeded with the interrogation of each venireman as his name was drawn from the hat. After the examination of each venireman was completed, the court heard and passed on challenges for cause. The State attempted to challenge for cause those who opposed capital punishment. The defendant attempted to challenge for cause those who favored capital punishment. The court made individual findings in each case. Challenges for cause were overruled if a venireman stated he could hear the evidence, the arguments of counsel, the charge of the court, consider all permissible verdicts, and could return a verdict based on the evidence and the law as defined by the court.

The record discloses that both the State and the defendant used all peremptory challenges allowed by law. The defendant sought to exercise a fifteenth peremptory challenge, and excepted when the court refused to allow it. The procedure employed in selecting the jury is set out in 416 pages of the record.

The sufficiency of the State's evidence to make out a case of murder in the first degree does not seem to be seriously challenged. Consequently, the evidence, only in short summary, is reported here.

In substance, the evidence disclosed that on June 22, 1968, the deceased, Mary Helen Kendrick Williams, a white woman, operated

"Mary's Custom Towel Outlet" in Shelby, Cleveland County. The one story·shop had three doors, one on the north and one on the south of the building, and a double door for loading on the east. The north and south doors apparently had glass panels. The double door on the east was secured from the inside by a 2 x 4 resting in hooks attached to the door facings. The main room of the shop contained display tables. There was a bathroom located off the display room.

Mrs. Lola Williams, mother-in-law of Mary Helen Kendrick Williams, called the towel shop over the telephone at 10:45 on the morning of June 22, 1968. Mary Helen answered. She seemed busy and the mother-in-law did not engage her in any further conversation.

At approximately 11:15 a.m., Mrs. Alberghini, a prospective customer, found the entrance door locked. Through the glass she saw a person, whom she identified as the defendant, inside the display room. She banged on the door in order to ascertain whether the shop would be opened. She turned away for a moment to speak to her daughter who was in an automobile parked near the door. When she looked again, the person inside had disappeared. ". . . I saw him . . . on the floor, looking around a table. . . . His face was right on the floor. . . ." The witness went to a place of business next door and had the police notified.

Officers Blankenship and Lowery arrived at about 11:30. They found all doors locked or barred. They saw the defendant inside the shop with a pistol in his hand. They also saw a human body and blood on the floor. They commanded the defendant to come out with his hands up. Instead, he concealed himself in the building. The officers then broke open a window and threw in a tear gas bomb. After a short interval, the defendant, forced out by the fumes, surrendered. He was unarmed. He had a bunch of keys in his pocket and a cigarette lighter with the letters "Bob" engraved thereon.

As soon as the fumes permitted, the officers entered the building. They found the nude body of Mrs. Williams behind one of the display tables. The body was warm and covered with blood.

The autopsy conducted by Dr. Gentry, a Pathologist, disclosed "gaping" head wounds and four penetrating stab wounds in the chest, and one in the abdomen. The chest wounds were five or more inches deep, two had penetrated the heart. In the opinion of Dr. Gentry, the stab wounds in the chest caused death.

A search of the room disclosed a part of a broken pistol grip near

the body. The articles of clothing which the victim wore to work that morning were found on the floor of the bathroom. The undergarments were in disarray. Some were turned wrongside out. Near the clothing, the officers found a pair of sun glasses, a pocket knife and a pistol with the grip broken. The broken part found near the body fitted the broken grip of the pistol found in the bathroom.

A State's witness testified that three days before the killing, he saw in the defendant's possession a knife similar to the one discovered in the bathroom and introduced in evidence. A clerk, who worked in Blanton's Variety Store near the shop, testified that about 9:30 or 10:00 on the morning of the homicide, she sold the defendant a pair of sun glasses. She exhibited to the jury a card which held eleven pairs of sun glasses — one space was empty. The witness stated the only sale from the card was made to the defendant. When asked whether the glasses found in the shop and introduced in evidence were the glasses she sold the defendant, she replied, "Yes, sir, I think they are."

The victim's daughter identified the cigarette lighter with the engraving "Bob" as belonging to her mother. This lighter was taken from the defendant's pocket after his surrender. The three keys also taken from the defendant's pocket were held together by two rings. One of the keys unlocked the south door, a second unlocked the north door, and the third unlocked the shop's cash register.

An expert in blood analysis testified that the blood splotches found on the defendant's clothing were of group A, the same type as the victim's blood.

At the close of the State's evidence, counsel for defendant moved for a directed verdict of not guilty. The court denied the motion. The defendant did not offer evidence. The court ruled that defense counsel had the right to open and conclude the argument. The defendant waived his right to open the argument, but did conclude. The ruling followed North Carolina practice.

After argument and the court's charge, the jury returned a verdict "guilty of murder in the first degree". The court denied defense motion to set aside the verdict. From the sentence of death in the manner provided by law, the defendant appealed.

*Robert Morgan, Attorney General; Burley B. Mitchell, Jr., Staff Attorney, for the State.*

*Chambers, Stein, Ferguson & Lanning by J. LeVonne Chambers and James E. Ferguson, II, for the defendant.*

HIGGINS, J.

The defendant, through his able and experienced counsel, by many objections and exceptions, has challenged the validity of the indictment, the trial, the verdict, and the sentence. The challenge to the indictment was based upon these grounds: (1) The grand jury in Cleveland County which returned the indictment was unlawfully constituted in that members of the defendant's economic class and race were systematically excluded from the jury list; (2) That a charge of murder in the first degree, carrying the death penalty, is cruel and unusual punishment and violates the defendant's Constitutional rights; (3) That G.S. 14-17, which provides the penalty of death for murder in the first degree, and G.S. 15-162.1, in effect at the time of the alleged offense (but later repealed), required the defendant to risk his life in order to exercise his right to a jury trial; (4) That the statute which gives the jury the right to recommend life imprisonment violates the defendant's constitutional rights in that no rules or standards are fixed by which the jury may be guided in determining whether to recommend life imprisonment.

[1]    The indictment was returned by a grand jury from Cleveland County. According to the evidence and the court's findings, the grand jury was properly constituted. Actually, approximately 50% of its members were of the defendant's race. There is no evidence with respect to the economic status of the members of the grand jury or of the defendant, other than the evidence and finding that all members of the jury were employed except one who was retired. The motion to quash the indictment on the first ground is not sustained. The other grounds assigned in the motion to quash are hereafter discussed in connection with the defendant's other objections and exceptions.

[2]    The defense counsel moved for a change of venue upon the ground of extensive and unfavorable publicity, not only in Cleveland County, but also in the adjoining counties of Gaston and Rutherford. In lieu of an order of removal, the court, as authorized by G.S. 9-12, ordered that a jury be summoned from the adjoining county of Burke. An original and two additional writs of venire facias were issued and returned. The defendant challenged the array of veniremen brought in under the authority of each writ. The ground of the challenge was that members of the defendant's economic class and race were systematically excluded from the jury list in Burke County. The court conducted a detailed inquiry, and upon proper evidence, found that 6 to 8% of the total population of

Burke County were members of the defendant's race. The inquiry disclosed that the special veniremen were impartially selected from a properly compiled jury list. Actually, two members of the colored race were summoned on the original venire, three on the first additional venire, and two on the second additional venire. The record does not disclose with certainty how many veniremen actually reported in obedience to the writs.

In the actual selection of the trial jury, the court permitted attorneys both for the State and for the defendant to explore in detail the background and fitness of each venireman to serve on the jury. The examinations followed the North Carolina practice and custom. Each venireman was individually sworn to make true answers to the court or anyone under its direction on matters touching his fitness to serve as a juror. The record of the examinations by the solicitor and defense counsel, and by the court are fully set out. The examinations and findings leading to the selection of the jury appear on 416 pages of the trial record. Members of the colored race were passed by the court as qualified to sit on the trial panel. The record shows that some of these, possibly all, were removed by peremptory challenge after their fitness to serve had been found by the court. The State did not exceed its number of peremptory challenges.

The jury selection conformed to the pattern approved by both State and Federal decisions. *Witherspoon v. Illinois,* 391 U.S. 510; *State v. Peele,* 274 N.C. 106, 161 S.E. 2d 568; *State v. Spence & Williams,* 274 N.C. 536, 164 S.E. 2d 593; *State v. Atkinson,* 275 N.C. 288, 176 S.E. 2d 241; *State v. Hill,* 276 N.C. 1, 170 S.E. 2d 885; *State v. Ruth,* 276 N.C. 36, 171 S.E. 2d 897. The record fails to disclose any violation of defendant's constitutional rights in the selection of the trial jury. The court's finding to that effect is sustained by the evidence.

To avoid misunderstanding, we call attention to the form of questions propounded to prospective jurors by counsel for the defendant, by the solicitor for the State, and occasionally by the court, concerning the venireman's attitude regarding the recommendation which the jury may make with respect to punishment in the event a guilty verdict had been agreed upon. Here is a question from the record: "Would you exercise an independent determination yourself, irrespective of how the other jurors felt on the matter of mercy or no mercy?" Here is a typical question: "If your verdict is guilty of murder in the first degree, would you consider recommending mercy?" G.S. 14-17 defines murder in the first degree and upon conviction "shall be punished with death: Provided, if at the time of rendering

its verdict in open court, the jury shall so recommend, the punishment shall be imprisonment for life in the state's prison, and the court shall so instruct the jury". The verdict in a criminal case is a basic part of the record proper. It should be correct. We need not speculate what judgment the court could impose if the jury did no more than recommend mercy.

[3]   A short summary of the State's evidence offered before the trial jury appears in the statement of facts. We hold the evidence was amply sufficient to make out a case of murder in the first degree and to sustain a verdict of guilty as charged. The defendant did not offer evidence. The court charged the jury to return one of four permissible verdicts: (1) Guilty of murder in the first degree; (2) Guilty of murder in the first degree with the recommendation that the punishment shall be imprisonment for life in the State's prison; (3) Guilty of murder in the second degree; (4) Not guilty.

[4]   The defendant, in addition to the grounds assigned in the motion to quash the indictment, contends the court committed error by failing to charge that the evidence permitted the jury to return a verdict "guilty of manslaughter". Evidence of manslaughter is lacking. The crime is defined as the unlawful killing of a human being without malice, express or implied, without premeditation and deliberation, and without the intention to kill or to inflict serious bodily injury. *State v. Kea,* 256 N.C. 492, 124 S.E. 2d 174; *State v. Foust,* 258 N.C. 453, 128 S.E. 2d 889; *State v. Benge,* 272 N.C. 261, 158 S.E. 2d 70.

[3, 5]   The evidence permitted the jury to find the defendant had inflicted numerous "club" wounds on his victim's head, four deep stab wounds in the chest, and one in the abdomen. These brutal wounds were inflicted on a helpless woman alone in her shop. The defendant was discovered in the shop armed with a pistol, attempting to hide, and when forced out by tear gas, he had in his pocket the victim's keys to the store doors and to the cash register. He also had in his pocket the victim's cigarette lighter. He had blood on his pockets and on his clothing. The sun glasses which he had bought less than two hours before were found under the victim's clothes in the bathroom. The disarray of the clothing would admit a finding the victim was forced to disrobe. The sun glasses and the knife were with the clothes. Any reasonable interpretation of the evidence permits a finding that the defendant did the killing with malice, after premeditation and deliberation (*State v. Walters,* 275 N.C. 615, 170 S.E. 2d 484), and in the perpetration or attempt to perpetrate a felony (*State v. Hill, supra; State v. King,* 226 N.C. 241, 37 S.E.

2d 684). Evidence of manslaughter or anything from which manslaughter might be inferred is absent. *State v. Ruth, supra; State v. Hill, supra; State v. Atkinson, supra.*

For the correct rule with respect to proof by circumstantial evidence, see *State v. Stephens,* 244 N.C. 380, 93 S.E. 2d 431.

**[6]** This Court, in many cases, has held valid the provision that the jury, after finding guilt of a capital felony, may return as a part of its verdict, a recommendation that the punishment shall be imprisonment for life in the State's prison. The court must impose the life sentence, and no other. The cases also hold that absent a recommendation, the court must impose the death sentence. Reasons for the holding are set forth in detail in *State v. Peele, supra; State v. Spence & Williams, supra; State v. Atkinson, supra; State v. Hill, supra; State v. Ruth, supra.* We adhere to the decisions for the reasons fully stated in the opinions.

**[7]** We think the General Assembly of 1949, which inserted the provision, intended to give the jury the unencumbered and unconditional right to make the recommendation. The purpose was to permit the jury, after hearing all the evidence, to determine whether the State would take or spare the life of the accused. We see no more objection to giving this power to the jury than to require it to decide between murder in the first degree and murder in the second degree. The former takes — the latter spares — the life of the accused. After guilt in a capital case has been established by the jury, its recommendation as to punishment does not violate the defendant's constitutional rights. "The States are free to allocate functions between the judge and the jury as they see fit." *Jackson v. Denno,* 378 U.S. 368 (Footnote 19) ; *State v. Hill, supra.*

**[8]** The defendant's objection to the provision which permits the jury to recommend life imprisonment on the ground that it lacks any standard or rule to govern a jury in determining whether to make a recommendation is not sustained. The very lack of any standard or rule leaves the jury without restriction, free to save the life of the accused as an unfettered act of grace. If rules or standards are prescribed, the right of the jury becomes restricted and fettered, and the chance of a recommendation is reduced. The defendant's claim that he is prejudiced by the provision, or the lack of guidelines for its use, is an empty argument.

**[9]** At the time the offense was committed and the indictment was returned in this case, G.S. 15-162.1 was in effect. The section permitted a defendant in a capital case to tender to the court a

written plea of guilty to the charge and if the solicitor for the State agreed to accept the plea, and the presiding judge approved, the acceptance had the effect of a verdict of guilty with a recommendation that the punishment should be imprisonment for life in the State's prison. The section was repealed effective March 15, 1969, eight months after the indictment was returned, but 43 days before the trial. The defendant never at any time tendered or attempted to tender to the State any written plea of guilty to the charge. Nevertheless, the defendant argues that G.S. 15-162.1 abolished capital punishment in North Carolina. The defendant cites as authority the Supreme Court decision in *United States v. Jackson,* 390 U.S. 570, and the United States Court of Appeals Fourth Circuit decision in *Alford v. North Carolina,* 405 F. 2d 340.

This Court has repeatedly held that G.S. 15-162.1 (Chapter 616, Session Laws of 1953) did not alter G.S. 14-17. The 1953 Act offered a means by which a defendant charged with a capital felony and his counsel were permitted to tender the plea of guilty, which plea, if and when accepted, had the effect of a conviction with a recommendation that the punishment be imprisonment for life in the State's prison. Neither the prosecutor nor the judge was under any obligation to accept the plea. Clearly, until the plea was offered and accepted, the offer was without legal effect. The Act provided: "Upon rejection of such plea (and of course if it was never tendered) the trial shall be upon the defendant's plea of not guilty, and such tender shall have no legal significance whatever." The repeal in 1969 neither added to, nor took from, G.S. 14-17. As stated by Justice Lake in *State v. Atkinson, supra,* the section, G.S. 14-17 ". . . is capable of standing alone". We do not interpret *United States v. Jackson, supra,* as deciding that capital punishment for first degree murder is abolished in North Carolina by G.S. 15-162.1.

In *Alford v. North Carolina, supra,* the United States Court of Appeals for the Fourth Circuit apparently attempted to pass on the validity of G.S. 14-17 and hold the death penalty invalid. A charge of murder in the first degree includes murder in the second degree and manslaughter. In the *Alford* case the defendant entered a plea of guilty of murder in the second degree and was sentenced to a prison term. We consider the decision neither authoritative nor persuasive.

[10] As in *Hill,* the defendant Roseboro has raised questions and presented arguments other than those which involve matters of law or legal inference, for example, the defendant's age, "around 16". The defendant failed to offer evidence indicating or suggesting lack

of legal responsibility for his criminal acts. Article IV, Section 10 of the North Carolina Constitution fixes the jurisdiction of this Court: "The Supreme Court shall have jurisdiction to review upon appeal any decision of the courts below upon any matter of law or legal inference."

**[11, 12]**    This Court has neither the power to change the law nor to remit the penalty the law exacts after conviction. The Court hears appeals and determines whether the trial court committed prejudicial error of law or legal inference. Hence, appeals for changes in the law should be made to the Legislature; appeals for relief from its penalties after conviction should be made to the Governor. *State v. Hill, supra; State v. Atkinson, supra.* The record before us fails to reveal error of law or legal inference in the defendant's indictment, trial, conviction or sentence. We find

No error.

BOBBITT, C.J., and SHARP, J., dissenting as to death sentence.

We vote to vacate the judgment imposing the death sentence. In our opinion, the verdict of guilty of murder in the first degree should be upheld and the cause remanded for pronouncement of a judgment imposing a sentence of life imprisonment.

The crime was committed on June 22, 1968, when our statutes relating to capital punishment for murder in the first degree were G.S. 14-17 and G.S. 15-162.1. It was and is our opinion that, until the repeal of G.S. 15-162.1 on March 25, 1969, the decisions of the Supreme Court of the United States in *United States v. Jackson,* 390 U.S. 570, 20 L. ed. 2d 138, 88 S. Ct. 1209 (1968), and in *Pope v. United States,* 392 U.S. 651, 20 L. ed. 2d 1317, 88 S. Ct. 2145 (1968), rendered invalid the death penalty provisions of G.S. 14-17. The reasons underlying our opinion have been stated fully in the dissenting opinions in *State v. Spence,* 274 N.C. 536, 164 S.E. 2d 593, and in *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241, and in *State v. Hill,* 276 N.C. 1, 171 S.E. 2d 897 (1969). Repetition is unnecessary.

G.S. 15-162.1 was repealed by Chapter 117, Session Laws of 1969. The 1969 Act, if construed to provide greater punishment for murder in the first degree than the punishment provided therefor when the crime was committed, would, in that respect, be unconstitutional as *ex post facto.* 16 Am. Jur. 2d, Constitutional Law § 396. In our view, if the death penalty provisions of G.S. 14-17 were invalid on June 22, 1968, when the crime was committed, they were invalid as to this defendant in April, 1969, when he was tried, convicted and sentenced.